STATE of Wisconsin, Plaintiff-Respondent,

v.

Charles CHVALA, Defendant-Appellant.†

Court of Appeals

*No. 03–0442–CR. Oral argument November 20, 2003.—Decided February 12, 2004.*

2004 WI App 53

(Also reported in 678 N.W.2d 880.)

† Petition to review granted 6-22-04.

118

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James A. Olson, Dixon R. Gahnz* and *John C. Carlson, Jr.* of *Lawton & Cates, S.C.*, Madison. There was oral argument by *Frank Gimbel, Stephen Meyer, James Olson,* and *Stephen Morgan.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jennifer E. Nashold, Barbara L. Oswalk*, attorneys general, and *Peggy A. Lautenschlager*, attorney general. There was oral argument by *Jennifer Nashold.*

Before Vergeront, Higginbotham and Anderson, JJ.

125

¶ 1. HIGGINBOTHAM, J. Charles Chvala, a senator in the Wisconsin Legislature, appeals a circuit court order denying his motion to dismiss Counts Seven through Ten of a criminal complaint, all charging him with felony misconduct in office, in violation of Wis. Stat. § 946.12(3).[1] Chvala contends § 946.12(3)[2] is unconstitutionally vague and overbroad as applied to this case. He also argues that this prosecution violates Wis. Const. art. IV, § 16, Wisconsin's speech and debate clause, and violates the separation of powers doctrine.

¶ 2. We conclude that Wis. Stat. § 946.12(3) is not unconstitutionally vague and overbroad because it provides reasonable notice to a reasonable legislator who is intent on complying with the law that using state resources and state time to engage in campaign activity is unlawful, because it establishes proper standards for adjudication of conduct and because no fundamental First Amendment right is implicated. We also conclude this prosecution does not violate the speech and debate clause of the Wisconsin Constitution. Finally, with the exception of certain activity alleged in the complaint and described in paragraphs 58 and 64 of this opinion, this prosecution does not violate the separation of powers doctrine. Accordingly, with this modification, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[2] WISCONSIN STAT. § 946.12 provides, in relevant part:

Any public officer . . . who does any of the following is guilty of a Class I felony:

(3) Whether by act of commission or omission, in the officer's . . . capacity as such officer . . . exercises a discretionary power in a manner inconsistent with the duties of the officer's . . . office . . . or the rights of others and with intent to obtain a dishonest advantage for the officer . . . or another . . . .

## BACKGROUND

¶ 3. Chvala, a Democrat, was elected to the Wisconsin State Senate in 1984. In 1995, his fellow Democrats elected him as the Senate Minority Leader and in 1996 as the Senate Majority Leader. Chvala served as the Majority Leader until this prosecution commenced in 2002, except for a period between April 1998 and January 1999 when he was again the Minority Leader. As the Majority Leader, Chvala was responsible for fundraising for the State Senate Democratic Committee as well as for Democratic State Senators and non-incumbent candidates in high profile races.[3]

¶ 4. The legislature created partisan caucuses in the 1960s and employed staff to further the purposes of the caucuses. Each party and each house of the legislature had its own caucus. As Senate Majority or Minority Leader, Chvala was responsible for hiring and firing the director of the Senate Democratic Caucus (SDC), who also reported directly to Chvala. The criminal complaint alleges that Chvala was also directly involved in the hiring of SDC staffers and at all times exercised final decision-making authority over this process. The SDC during the relevant time periods maintained state-leased office space in Madison, Wisconsin. The SDC staff consisted of a director, a deputy director, two analysts responsible for maintaining databases, a graphic artist and approximately five policy analysts and a receptionist. All of these employees worked for the State in state-leased offices using state-owned or state-leased equipment.

---

[3] Although Chvala denies the charges in the complaint, for the purposes of his motion to dismiss, he accepts the allegations as true.

¶ 5. A criminal complaint was filed on October 17, 2002, charging Chvala with extortion, misconduct in office and violations of various campaign finance laws. Counts Seven through Ten of the complaint charge Chvala with felony misconduct in office, in violation of WIS. STAT. § 946.12(3), for hiring SDC staff and directing their work on various Democratic political campaigns. Chvala filed a motion to dismiss all twenty counts of the criminal complaint. The circuit court denied Chvala's motion to dismiss. With respect to Counts Seven through Ten, the circuit court denied Chvala's motion to dismiss, concluding that § 946.12(3) was not vague because WIS. STAT. chs. 11 and 19, as well as the Senate Policy Manual, firmly establish that political campaigning is not permitted on state time with state resources. The circuit court rejected Chvala's claim that § 946.12(3) violated the separation of powers doctrine on the same grounds. The circuit court also rejected Chvala's speech and debate clause argument, determining that hiring and directing state employees to conduct campaign activity on state time with state resources was not protected legislative activity and was not an integral part of the legislative process.

¶ 6. Chvala filed a petition for leave to appeal. We granted leave to appeal, but only for Counts Seven through Ten, concluding that Chvala did not satisfy the criteria for granting leave to appeal on the remaining issues presented in the petition. Consequently, this decision addresses Chvala's appeal only as to Counts Seven through Ten.

## DISCUSSION

### *Vagueness/Overbreadth*

#### *Vagueness*

¶ 7. Chvala contends Wis. Stat. § 946.12(3) is unconstitutionally vague because it fails to give him notice that hiring and directing SDC staff to work on campaigns on state time with state resources violates his "duty" as a state legislator and fails to provide him notice that such actions could result in a felony prosecution for misconduct in office. Chvala argues that the State has failed to identify any statute specifically prohibiting him from engaging in political activity on state time with state resources and that the complaint fails to allege the basis for the duty that Chvala was to have violated. Chvala also argues that the State has failed to cite any statute that expressly creates a duty specific to him as a senator, which, if violated, could result in criminal prosecution.

¶ 8. The State counters by arguing that Chvala has failed to establish that Wis. Stat. § 946.12(3) as applied to him is unconstitutional beyond a reasonable doubt because the statute provides him with adequate notice that he had a duty to refrain from hiring and directing SDC staff to engage in partisan campaigns using state resources and funds. The State further argues Chvala had a clear fiduciary duty to the public to refrain from using taxpayer dollars to run private political campaigns and that the Senate's own rules prohibit the type of activities in which Chvala was engaged. The State points to Wis. Stat. chs. 11, 12 and 19 as explicitly establishing Chvala's duty as a public

official to refrain from engaging in the conduct for which he faces prosecution.[4]

¶ 9. We review the constitutionality of statutes *de novo,* without deference to the trial court. *State v. Bertrand,* 162 Wis. 2d 411, 415, 469 N.W.2d 873 (Ct. App. 1991). Statutes enjoy a presumption of constitutionality and we review the statutes so as to preserve their constitutionality. *Id.* A party challenging the constitutionality of a statute must demonstrate that it is unconstitutional beyond a reasonable doubt. *State v. Pittman,* 174 Wis. 2d 255, 276, 496 N.W.2d 74 (1993).

¶ 10. Whether a statute is unconstitutionally vague as applied is a question of law. *Pittman,* 174 Wis. 2d at 276. A vagueness challenge must satisfy a two-prong test:

> The first prong of the vagueness test is concerned with whether the statute sufficiently warns persons 'wishing to obey the law that [their] . . . conduct comes near the proscribed area.' The second prong is concerned with whether those who must enforce and apply the law may do so without creating or applying their own standards.

*Id.* (citations omitted). A statute is not unconstitutionally vague "simply because in some particular instance some type of conduct may create a question about its

---

[4] The State first argues Chvala lacks standing to challenge Wis. Stat. § 946.12(3) on vagueness grounds, *see State v. Tronca,* 84 Wis. 2d 68, 87, 267 N.W.2d 216 (1978), because Chvala was aware "of the criminality of his conduct and the consequences." *Id.* The crux of this case is that § 946.12(3) failed to give Chvala notice that his alleged conduct could lead to a felony prosecution. Because we address the issue squarely, we need not address the more tangential issue of standing.

130

impact under the statute." *State v. Smith,* 215 Wis. 2d 84, 91–92, 572 N.W.2d 496 (Ct. App. 1997) (citation omitted).

> The ambiguity must be such that 'one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the statute or rule.'

*Pittman,* 174 Wis. 2d at 277 (citation omitted). A person whose conduct intentionally comes close to "an area of proscribed conduct" assumes the risk that his conduct may fall into the area of proscribed conduct. *State v. Courtney,* 74 Wis. 2d 705, 711, 247 N.W.2d 714 (1976) (citations omitted). A criminal statute is not vague if "by the ordinary process of construction, a practical or sensible meaning may be given to the . . . [law] . . . ." *State v. Arnold,* 217 Wis. 340, 345, 259 N.W. 843 (1935).

¶ 11. We first determine, under the first prong of *Pittman,* whether WIS. STAT. § 946.12(3) sufficiently warns Chvala, as a legislator and a reasonable person wishing to obey the law, that his alleged conduct approaches the proscribed activity. Section 946.12(3) prohibits the exercise of a discretionary power in a manner inconsistent with the duties of an officer's office. The existence of a duty is a question of law. *State v. Schwarze,* 120 Wis. 2d 453, 456, 355 N.W.2d 842 (Ct. App. 1984).

¶ 12. Chvala contends no statute specifically identifies his duty as a legislator and the State has not identified any statute establishing that duty. Chvala also argues the complaint does not specifically state

what duty has been transgressed leading to this prosecution. The State argues Chvala's duty as a public official and as a state legislator is determined by various sources, including Senate rules and policies, state statutes and his common law fiduciary duty to the public to use public funds for public purposes, all of which, the State claims, make it clear that managing private campaigns on state time with state resources is unlawful.[5] Chvala asserts that the statutes relied upon by the State as establishing his "duty" do not apply. Chvala criticizes the State for "cobbling" together these statutes and ethics codes, as well as the State Senate Policy Manual, to create his duty. The State explains that the legislature prescribed a broad scope of conduct by enacting WIS. STAT. § 946.12(3), which may be interpreted in a flexible manner so as to bring the alleged conduct here under the statute's constrictions.

¶ 13. We conclude the arguments Chvala asserts are without merit. Chvala cites no authority for the proposition that we are confined to a specific statute or to one specific source to ascertain his duty as a legislator. Moreover, "[t]he duty [under WIS. STAT. § 946.12(1)] may be imposed by common law, statute, municipal ordinance, administrative regulation, and perhaps other sources . . . ." *Judiciary Committee Report on the Criminal Code,* Wisconsin Legislative Council, February 1953, p. 176. Although this' language pertains to § 946.12(1), we find no reason to not extend it to

---

[5] Because we conclude Chvala's duty as a senator for purposes of prosecution under WIS. STAT. § 946.12(3) may be determined by sources other than his common law fiduciary duty, we need not address this part of the State's argument. Furthermore, our analysis is not limited to the sources identified by the State.

§ 946.12(3). Both subsections refer to the same "duty" which, if violated, may lead to criminal prosecution. We therefore conclude that a legislator's duty under § 946.12 may be determined by reference to a variety of sources, which in this case, includes the Senate Policy Manual, applicable statutes and legislative rules and guidelines. *See State v. Tronca*, 84 Wis. 2d 68, 80, 267 N.W.2d 216 (1978) ("the powers of a public official . . . are not limited to expressly conferred powers but apply to *de facto* powers which arise by custom and usage . . . ."); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995) (a United States congressman may be held to the law and rules of Congress). We now turn our attention to determine the scope of Chvala's duty as a legislator.

¶ 14. The general duty of a legislator is to determine "policies and programs and review of program performance for programs previously authorized . . . ." Wis. Stat. § 15.001(1). We examine other sources of Chvala's duty in light of this general declaration.

¶ 15. The Senate created the Senate Policy Manual pursuant to its authority to establish self-regulating internal rules of conduct. *See* Wis. Const. art. IV, § 8.[6] The State contends the following section of the Senate Policy Manual creates a duty for senators:

> No political activity is permitted during working hours. No State facility, office equipment, supplies, etc. may be used for political purposes at any time. During non-office time, employes may exercise their citizenship rights by political activity and community involvement.

---

[6] Wisconsin Const. art. IV, § 8 provides:

Each house may determine the rules of its own proceedings, punish for contempt and disorderly behavior, and with the concurrence of two-thirds of all the members elected, expel a member; but no member shall be expelled a second time for the same cause.

(Senate Policy Manual I-14). Chvala asserts this rule fails to provide fair notice that using public funds and resources for partisan campaigns violates the statute because the Senate Policy Manual does not define "political activity." The State points us to a document issued by Donald Schneider, Clerk of the Wisconsin Senate, entitled "Wisconsin State Senate Guidelines for Incumbents" (Guidelines),[7] which is distributed in May of each election year to Senate members and to WIS. STAT. § 11.01(16)(a)[8] as establishing that "political activity" and "political purpose" refer to political campaign activity.

■■

¶ 16. We conclude that the terms "political activity" and "political purpose" as used in the Senate Policy Manual plainly include political campaign activity. It is unreasonable to equate "political activity" and "political purpose" with "legislative activity" as urged by Chvala. Rather, it is apparent from the context within which these words are used that the Senate Policy Manual and the Guidelines restrict the type of activity at issue in this case: political campaigning with public resources.[9]

---

[7] The Guidelines state that in November of 1977, "the Senate established a written policy that State equipment and supplies are strictly for conducting official state business and are not to be used at all for political campaign activities."

[8] The State's citation to WIS. STAT. § 11.01(16)(a) is inaccurate. The proper citation is WIS. STAT. § 11.01(16), which states in relevant part: "An act is for 'political purposes' when it is done for the purpose of influencing the election or nomination for election of any individual to state or local office . . . ."

[9] Chvala refers to the Senate Chief Clerk's definition of the purpose of the legislative caucus as supporting his argument that the Senate Policy Manual fails to provide him with sufficient notice that he could be prosecuted for misconduct in

■■■■

¶ 17. Chvala claims he was aware of the potential for being disciplined for violating Senate rules but was not aware he could face felony prosecution for violating Wis. Stat. § 946.12(3). Whether Chvala was aware that he could face felony prosecution for violating the statute is irrelevant. The vagueness challenge is based on what a reasonable person who is intent on obeying the law can be expected to understand what the law prohibits. Therefore, "[t]he defendant's ignorance of the law or negligence as to the existence of the law is not a defense." *State v. Collova*, 79 Wis. 2d 473, 488, 255 N.W. 2d 581 (1977).

¶ 18. Chvala is charged with hiring and directing SDC employees to conduct campaign activities and the complaint contains sufficient facts to establish that state offices, equipment and supplies were used on these campaigns. Chvala clearly had a duty as a legislator to steer clear of this proscribed area of conduct.

¶ 19. An additional source of Chvala's duty as a public official is Wis. Stat. § 11.001(2), which is the declared policy that an incumbent is to not have an unfair advantage over a non-incumbent. Section 11.001(2) states:

> This chapter is . . . intended to ensure fair and impartial elections by precluding officeholders from utilizing the perquisites of office at public expense in order to gain an advantage over nonincumbent candidates who have no perquisites available to them.

Chvala was the Democrat's leader in the Senate from 1995 through 2002. In this capacity Chvala was also the

public office for not complying with the rule. However, this document was prepared after Chvala allegedly committed the misconduct charged here and is therefore irrelevant.

leader of the SDC. Chvala, as the Majority or Minority Leader, hired, directed and fired SDC employees. He had ultimate control over SDC employee work assignments and controlled their wages. The complaint alleges Chvala used his power and authority, which are perquisites of his office as Senate Majority or Minority Leader, at public expense, in order to gain an advantage over nonincumbent candidates by hiring and directing SDC employees to engage in partisan campaigns for incumbent Senators and non-incumbent senatorial candidates. A reasonable legislator can easily conclude by the language of this statute that directing SDC staff to engage in political campaign activity with state resources is inconsistent with the rights of others and is intended to obtain a dishonest advantage. We conclude the State may rely on § 11.001(2) as a source of Chvala's duty as a legislator to prosecute him for criminal misconduct in office.

¶ 20. Chvala's duty as a legislator is sufficiently delineated in the Senate Policy Manual, in the Guidelines issued by Senate Chief Clerk Schneider in May of every election year and in WIS. STAT. § 11.001(2) such that a reasonable person would be aware that using discretionary powers to obtain a dishonest advantage over others by waging partisan political campaigns with state resources violates one's duty as a public official. We conclude Chvala has not satisfied the first prong of the *Pittman* test because he had notice that directing SDC staff to work on political campaigns with state resources violated his duty as a public official, and therefore violates § 946.12(3).

¶ 21. The second prong of the *Pittman* test for vagueness, whether those who must enforce and apply the law may do so without creating or applying his or her own standards, has also not been met. A clear duty

has been established prohibiting Chvala from engaging in the conduct alleged in Counts Seven through Ten. The standards are clear for those who enforce and apply Wis. Stat. § 946.12(3): Chvala's duty as a legislator is to not direct and manage SDC employees to run political campaigns. This standard is unambiguous and can be easily applied. Accordingly, we conclude § 946.12(3) is not unconstitutionally vague as applied to this case.

*Overbreadth*

¶ 22. Chvala next argues Wis. Stat. § 946.12(3) is unconstitutionally overbroad as applied to the facts of this case. He maintains that the statute criminalizes legitimate legislative activity and, as a result, will have a chilling effect on legislators in serving their constituents. Chvala asserts that this prosecution "implicates core First Amendment values at every turn," claiming that a legislator and her or his staff speak, assemble, and petition as part of their duties every day. The State counters by arguing that under *Tronca* the *facial* validity of § 946.12(3) has been upheld against a claim of overbreadth and therefore Chvala's claim of overbreadth must fall. In the alternative, the State argues that the prohibitions of § 946.12(3), as applied to this case, regulate conduct, not speech. Finally, the State contends that should we find the statute susceptible to First Amendment scrutiny, Chvala's arguments must still fall because the charged violations of § 946.12(3) are reasonable, content-neutral restrictions. Because our conclusion that § 946.12(3) regulates conduct and not speech is dispositive, we do not take up the State's other arguments.

¶ 23. An overbreadth challenge to a statute invokes the protections of the First Amendment to the United States Constitution. *See generally State v. Stevenson,* 2000 WI 71, 236 Wis. 2d 86, 613 N.W.2d 90. Invalidation of a statute on overbreadth grounds is "strong medicine" that is "employed by the Court sparingly and only as a last resort." *State v. Janssen,* 219 Wis. 2d 362, 373, 580 N.W.2d 260 (1998), *quoting Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). "A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." *Janssen,* 219 Wis. 2d at 374 (citation omitted). The overbreadth doctrine is grounded in the right to substantive due process and "has the effect of preventing the limiting, by indirection, of constitutional rights." *Tronca,* 84 Wis. 2d at 89 (citation omitted).

¶ 24. WISCONSIN STAT. § 946.12(3) is aimed at specific conduct which, in this case, goes to the use of state resources for conducting political campaigns. Legislators or their employees are not prohibited from doing or saying anything related to participation in political campaigns so long as they do not use state resources for that purpose. Moreover, legitimate legislative activity is not constrained by this statute. The line between what is "legislative activity" and what is "political activity" is sufficiently clear so as to prevent any confusion as to what conduct is prohibited under this statute. To the extent legitimate legislative speech is affected, it is purely secondary to the offensive conduct of campaigning on state time with state resources. *See generally State v. Robins,* 2002 WI 65, ¶¶ 41–42, 253 Wis. 2d 298, 646 N.W.2d 287.

¶ 25. Chvala's overbreadth attack is premised on what he considers to be the likely occurrence of two scenarios or hypotheticals. In the first hypothetical, Chvala claims a state senator would violate WIS. STAT. § 946.12(3) by hiring a person to work as a part-time legislative aide and as a part-time campaign fundraiser. In his second hypothetical, Chvala claims a senator could face charges under § 946.12(3) by using research conducted by a legislative aide for legitimate legislative business against a rival's opponent in an upcoming election. We do not agree with the logic of either hypothetical.

¶ 26. In the first hypothetical, the duties of a legislative aide are considerably different than those of a campaign fundraiser. A legislator such as Chvala should and would know the difference. Moreover, the Senate Policy Manual and the Guidelines issued by Senate Chief Clerk Donald Schneider provide clear guidance as to when the lines between the two positions are being crossed. This hypothetical does not present any scenario under which an individual's fundamental right to free speech is impinged.

¶ 27. Similarly, the fruits of an aide's research conducted for legitimate legislative activity may be available to anyone, including the public, upon a proper open records request. Certainly, information and data collected by research is public information and can be disseminated to anyone regardless of the purpose or use of the information.

■■■

¶ 28. We cannot conceive of any circumstance, based on these hypotheticals, that a senator could be prosecuted for engaging in legitimate legislative activity. No prosecutor could reasonably or credibly apply the statute to legislative activity of a legitimate nature.

Under the facts of this case, WIS. STAT. § 946.12(3) would apply only if the senator engaged in conduct involving the use of state resources on state time for activities falling outside legitimate legislative activity. We, therefore, conclude that § 946.12(3) is not unconstitutionally overbroad.

### *Speech and Debate Clause*

¶ 29. Turning to Chvala's next argument, he contends that he is protected from prosecution under the speech and debate clause of the Wisconsin Constitution, WIS. CONST. art. IV, § 16.[10] Chvala claims legislative privilege and immunity under art. IV, § 16 from inquiry into acts integral to the legislative process: personnel decisions involving SDC and legislative staff. The State disagrees, contending that operating partisan campaigns on state time with state resources is not an integral part of the legislative process and therefore the privilege does not apply; in addition, even if Chvala's personnel decisions are arguably legislative in nature, art. IV, § 16 does not protect this activity because hiring and managing state employees to direct political campaigns contravenes the intent of the speech and debate clause. In the alternative, the State contends Chvala may still face prosecution because a specific statute gives the executive and judiciary branches the right to inquire into his personnel decisions.

¶ 30. Whether a statute violates the speech and debate clause presents a question of constitutional interpretation. *See generally State v. Beno*, 116 Wis. 2d

---

[10] WISCONSIN CONST. art. IV, § 16 provides "No member of the legislature shall be liable in any civil action, or criminal prosecution whatever, for words spoken in debate."

140

122, 341 N.W.2d 668 (1984). The framers' objective in enacting Wis. Const. art. IV, § 16 was "to ensure the independence of the legislature and the integrity of the legislative process by precluding the possibility of intimidation or harassment of members of the legislature." *Beno,* 116 Wis. 2d at 141. "The framers' judgment was that the courts are not the proper place to hold legislators accountable as elected representatives for 'words spoken in debate.' " *Id.* at 141–42.

¶ 31. Recognizing the necessity of protecting legislators from attack based on legitimate legislative activity, the framers of the Wisconsin Constitution constructed a firewall to ensure legislators were not unreasonably constrained from engaging in activities "necessary for the adequate functioning of the state legislative body." *Id.* at 142. Wisconsin Const. art. IV, § 16 protects legislators from adverse judgments, whether civil or criminal, and from questioning in judicial proceedings. *Beno,* 116 Wis. 2d at 142. The protections of art. IV, § 16 extend to matters integral to the legislative process and to the consideration of proposed legislation and other matters "which are within the regular course of the legislative process." *Beno,* 116 Wis. 2d at 143–44. "[T]o be protected[,] the legislative activity must be related closely to the purposes justifying the protection." *Id.* at 144.

¶ 32. Not all activities of a legislator are protected by Wis. Const. art. IV, § 16 insofar as that activity is not "an integral part of the deliberative and communicative processes . . . ." *Gravel v. United States,* 408 U.S. 606, 625 (1972); *see also Beno,* 116 Wis. 2d at 142. "The constitution literally protects the member from liability

for 'words spoken in debate.' The clause thus focuses upon matters occurring in legislative deliberations." *Beno*, 116 Wis. 2d at 142. The Wisconsin Supreme Court undertook a historical review of art. IV, § 16, acknowledging that

> [t]he court's task of defining the bounds of the legislative privilege is difficult. The court must ensure that legislative privileges are broad enough to protect the integrity of the legislative process, but not so broad as to endow a legislator with unlimited absolute personal immunity from substantive liability or from any obligation to testify in a judicial proceeding. Judicial action may be needed to serve broad public interests, as when the court acts not in derogation of the separation of powers but to maintain the proper checks and balances or to vindicate the public interest.

*Beno*, 116 Wis. 2d at 142–43. Thus, art. IV, § 16 does not bar courts from exercising jurisdiction over legislators. *Beno*, 116 Wis. 2d at 142. While legislative acts are protected by the speech and debate clause, political acts are not. *See United States v. Brewster*, 408 U.S. 501, 528–29 (1972). Legislators regularly engage in activities that fall outside of the legislative process and are inherently political in nature, such as constituent contact, the issuance of press releases, speech making and newsletter mailings to constituents and others. These activities have been held as not protected by the United States speech and debate clause. *Id.* at 512. We thus consider whether Chvala is protected from judicial and executive examination of his conduct as alleged in the complaint pursuant to art. IV, § 16.

¶ 33. In our analysis, however, we are not bound by the construction given the speech and debate clause of the United States Constitution by the United States

142

Supreme Court in interpreting Wis. Const. art. IV, § 16. *Beno,* 116 Wis. 2d at 134. Chvala supports his arguments by reference to opinions issued by the United States Supreme Court and other federal courts. The two speech and debate articles differ in both language and focus, with art. I, § 6 of the United States Constitution protecting a federal legislator from being "questioned in any other place," "for any speech or debate in either house," and art. IV, § 16 of the Wisconsin Constitution providing that members will not be "liable in any civil action, or criminal prosecution whatever, for words spoken in debate." Thus, because of the different language between the federal and state constitutions, there is no "clear implication as to the meaning of the state clause" by construing the federal speech and debate clause. *Beno,* 116 Wis. 2d at 136. To the extent we refer to federal case law, we do so as a means of illuminating our analysis. However, we are not bound by the conclusions made in those decisions.

¶ 34. We now consider whether hiring, directing and managing legislative caucus staff to oversee political campaigns is protected by Wis. Const. art. IV, § 16. Chvala first argues that *Beno* stands for the proposition that to protect against executive and judicial harassment of the legislature, art. IV, § 16 should apply broadly to protect the legislators not only from adverse civil and criminal judgments but also from mere questioning in a judicial proceeding. He contends that this section reaches "matters that are an integral part of the processes by which members of the legislature participate" with respect to either of two broad categories of activities: (1) "the consideration of proposed legislation," or (2) "other matters within the regular course of the legislative process."

143

¶ 35. Chvala claims that support for his arguments can be found in *Browning v. Clerk, United States House of Representatives,* 789 F.2d 923 (D.C. Cir. 1986), where the Court held that "if the employee's duties are an integral part of the legislative process, such that they are directly assisting members of Congress in the 'discharge of their functions,' personnel decisions affecting them are correspondingly legislative and shielded from judicial scrutiny." *Id.* at 929. Chvala contends that the description of the caucus job responsibilities is overwhelming evidence of the integral part that the caucus employees play in the legislative process. He argues "that SDC employees who are charged with policy-making responsibility are vital to the legislative process, and thus decisions relating to their employment are privileged under the speech or debate clause." Chvala insists that legislative hiring and firing decisions must be viewed through the lens of the speech and debate clause.

¶ 36. Chvala also claims he is being criminally charged because of job duties he allegedly included in the SDC positions at issue here and because of work assignments he gave to SDC employees. He argues that these allegations go to the core of the speech and debate clause because his ability to assign tasks and job duties to his legislative and caucus staff is "within the regular course of the legislative process." Chvala contends that using SDC staff as political operatives is part of the legislative process that the speech and debate clause was designed to protect.

¶ 37. The State counters that WIS. CONST. art. IV, § 16 does not encompass political activities. First, it argues that under *Beno* the supreme court emphasized that not all conduct is protected by the speech and debate clause. Citing to *Gravel*, the State asserts that

the speech and debate clause protects words and actions occurring only in legislative deliberations and matters properly within the jurisdiction of the legislature. The State contends that Chvala's activities, as alleged in the complaint, do not fall within the legislative sphere and are not integral to the legislative process. The State points out that Chvala has not demonstrated how his activities in hiring and directing SDC staff to conduct political campaigns with state resources and on state time "relate to either the consideration of proposed legislation or other matters which are within the regular course of the legislative process." We are persuaded by the State's arguments.

¶ 38. We agree that as a legislator, Chvala is protected by the speech and debate clause for his personnel decisions that serve the important tasks undertaken by a legislator. We are mindful that it would be inappropriate to scrutinize Chvala's employment decisions that further his legitimate duties as a legislator. The speech and debate clause prevents judicial intrusion into areas uniquely legislative.

¶ 39. The Wisconsin Supreme Court, however, has already determined that legislators are subject to judicial action. *See Beno*, 116 Wis. 2d at 142. Chvala is not being prosecuted for his legislative acts or for personnel decisions integral to the execution of those acts. We read Counts Seven through Ten as not requiring testimony regarding his legislative acts. However, we do not construe WIS. CONST. art. IV, § 16 as preventing judicial and executive inquiry into personnel decisions made by a legislator that appear on the face of the criminal complaint to violate WIS. STAT. § 946.12(3).

Here, the criminal complaint specifically identifies personnel decisions made by Chvala that bear no resemblance and are not even tangential to "the *due functioning* of the legislative process." *Browning,* 789 F.2d at 929 (citation omitted). The speech and debate clause of the Wisconsin Constitution serves as no bar to Chvala's prosecution under § 946.12(3).

¶ 40. We also conclude that Chvala's reliance on *Browning* is misplaced. The facts of this case are distinguishable from that one in that the duties performed by the court reporter dismissed by a member of Congress were integral to the legislative process. *Id.* at 929. However, in this case, the allegations in the complaint are that SDC and legislative staff members directed by Chvala to run political campaigns were not engaged in any legitimate legislative duties.

¶ 41. We conclude that WIS. CONST. art. IV, § 16 does not protect the activities alleged in the complaint. It is difficult to conceive how directing and managing state employees to engage in private political campaign activity can be construed as activity integral to the legislative process. By its very nature, engaging in campaign activity is political. Chvala is alleged to have hired a person ostensibly as a legislative aide whose sole purpose was to manage a political campaign. Chvala is also charged with attempting to hire another individual for the same purpose and with directing SDC staff as they worked on various private campaigns. These allegations go to conduct which, if proven, fall far outside of "what is necessary to preserve the integrity of the legislative process." *Brewster,* 408 U.S. at 517. Running partisan campaigns with public funds and resources is not "necessary for the adequate functioning of the state legislative body." *Beno,* 116 Wis. 2d at 142.

### Separation of Powers

¶ 42. Finally, Chvala contends that he is being prosecuted under WIS. STAT. § 946.12(3) in violation of the separation of powers doctrine. He first argues that under WIS. CONST. art. IV, § 8, the Senate has the exclusive power to regulate, police and discipline its own members. Chvala also claims that consideration of whether a particular activity is "legislative" or "political" is a non-justiciable "political question" and is therefore beyond the court's inquiry.

¶ 43. The State counters that the Senate has established a rule creating the duty to refrain from running political campaigns with public resources by enacting WIS. STAT. § 946.12(3), through the Senate Policy Manual, the Guidelines and WIS. STAT. chs. 11, 12 and 19. The State asserts that Chvala's arguments put him beyond the law. It further argues that the official misconduct charges in this case are justiciable because each charge rests on unambiguous legal standards and does not interfere with any unique function of the legislature.

■■■■

¶ 44. Whether a statute violates the doctrine of separation of powers presents a question of law. *Barland v. Eau Claire County*, 216 Wis. 2d 560, 572, 575 N.W.2d 691 (1998). "The doctrine of separation of powers, while not explicitly set forth in the Wisconsin constitution, is implicit in the division of governmental powers among the judicial, legislative and executive branches." *State ex rel. Friedrich v. Dane County Circuit Court*, 192 Wis. 2d 1, 13, 531 N.W.2d 32 (1995). "The Wisconsin constitution creates three separate coordinate branches of government, no branch subordinate to the other, no branch to arrogate to itself control over

the other except as is provided by the constitution, and no branch to exercise the power committed by the constitution to another." *State v. Holmes*, 106 Wis. 2d 31, 42, 315 N.W.2d 703 (1982). "Each branch has a core zone of exclusive authority into which the other branches máy not intrude." *State ex rel. Friedrich*, 192 Wis. 2d at 13. In these core areas, "*any* exercise of authority by another branch of government is unconstitutional." *Barland*, 216 Wis. 2d at 573–74 (citation omitted).

¶ 45. However, the majority of governmental powers lie within areas of shared authority, where the powers of the branches overlap. *Id.* at 573. "In these areas of 'shared power,' one branch of government may exercise power conferred on another only to an extent that does not unduly burden or substantially interfere with the other branch's exercise of power." *Id.*

¶ 46. Chvala contends the legislature possesses the "core zone of exclusive authority" in determining the proper application of its rules to its own members, an area not to be intruded upon by the executive or judiciary branches of government. In furthering this proposition, Chvala relies on the supreme court's ruling in *State ex rel. La Follette v. Stitt*, 114 Wis. 2d 358, 338 N.W.2d 684 (1983), as establishing an absolute bar to the judiciary interpreting legislative rules. The State argues neither Wis. Const. art. IV, § 8 nor *Stitt* applies to this case because Chvala is not being prosecuted for mere "errors, nonfeasance or questionable procedure" and neither the executive nor the judiciary is intruding into the Senate's ability to "determine the rules of its own proceedings." Chvala, the State points out, is facing prosecution because he violated a criminal statute, namely, Wis. Stat. § 946.12(3).

¶ 47. Chvala misconstrues the court's holding in *Stitt*. One of the issues before the *Stitt* court was whether the court had the authority to determine whether the legislature complied with its own internal operating rules or procedural statutes in the course of enacting legislation. *Stitt*, 114 Wis. 2d at 364. The court was reluctant to do so because of the separation of powers doctrine and comity. *Id.* at 364–65.

¶ 48. This case presents an entirely different issue. The court is not being asked to enforce legislative rules governing the enactment of legislation. Rather, the court is being asked to enforce a penal statute that relates to the duties of a legislator and are relevant insofar as it gives affected persons notice of those duties.

¶ 49. We conclude that examination of the Senate Policy Manual and the Guidelines to determine whether Chvala violated his duty as a legislator does not intrude into the legislature's authority to establish its own rules of conduct and to discipline its members for any violation thereof. Chvala is not facing prosecution for violating the Senate's internal rules but for having committed criminal misconduct in office.

¶ 50. Chvala finally argues that a determination of whether a particular activity is legislative or political requires an inquiry into the interworkings of a senator and a staff member, which is a "political question" and is therefore non-justiciable under *Baker v. Carr,* 369 U.S. 186 (1962). In *Baker*, the United States Supreme Court considered the justiciability of claims implicating the political question doctrine. *Id.* at 208–09. The Supreme Court noted that various formulations of the political question doctrine involved a function of the separation

of powers. *Id.* at 210–11. The Supreme Court held that an issue is non-justiciable if "prominent on the surface" of that issue it finds

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. The first and second factors are implicated in this case.

¶ 51. As for the first factor, Chvala contends that because the State is prosecuting him based, in part, on a Senate rule, to proceed with the prosecution violates WIS. CONST. art. IV, § 8. He simply repeats the argument already set forth above pertaining to restrictions on the Court's ability to interpret legislative rules. For the reasons already stated we reject Chvala's arguments on this issue.

¶ 52. Chvala's primary argument focuses on the second *Baker* factor. Chvala contends there are no judicially manageable standards to prosecute him under WIS. STAT. § 946.12(3). Although not clearly argued by him, Chvala's argument appears to relate to whether the rule prohibiting engaging in political campaign activity is sufficiently ambiguous so as to be non-justiciable. *See Rostenkowski,* 59 F.3d at 1306. To phrase the issue differently, may a court interpret an

internal legislative rule to determine criminal liability if, when applied to the facts of the specific case, the rule is not ambiguous? We conclude it can.

¶ 53. Although we are not bound by *Rostenkowski*, we consider the analysis employed by the court to be sound, and we adopt it here. Congressman Daniel Rostenkowski was prosecuted for misappropriation of public funds by paying staff members to perform personal services for him. *Id.* at 1294–95. Rostenkowski moved to dismiss these charges because the prosecution was based on an interpretation of the Rules of the House of Representatives, which, he argued, violated the Rulemaking Clause of the United States Constitution and the separation of powers doctrine. *Id.* at 1302. The federal Rulemaking Clause is similar to Wis. Const. art. IV, § 8 in that it empowers Congress to "determine the rules of its proceedings, punish its members for disorderly behaviour, and, with the concurrence of two-thirds, expel a member." U.S. Const. art. I, § 5. The court noted that the Government would likely rely upon the House Rules to prove the criminal allegations. *Rostenkowski*, 59 F.3d at 1305. Rostenkowski argued that the House Rules do not provide a "judicially discoverable and manageable standard for" determining whether his use of federal funds was authorized or not, therefore requiring the court to determine policy. *Id.* at 1306. The *Rostenkowski* court noted, "a sufficiently ambiguous House Rule is non-justiciable." *Id.* However, the court determined it would be appropriate for the judiciary to interpret House Rules where "a particular House Rule is sufficiently clear that we can be confident of our interpretation . . . ." *Id.* Thus, where "a court cannot be confident that its interpretation is correct," the court will not interpret the Rule. *Id.* The court then proceeded to review the individual counts in the indict-

151

ment to determine whether the trial court would be required to interpret ambiguous House Rules. *Id.* at 1307.

¶ 54. The situation before us is similar. The State is relying, in part, on a Senate rule as stated in the Senate Policy Manual and a rule stated in the Guidelines to determine whether Chvala violated his discretionary duty as a public official by directing caucus and legislative staff to run political campaigns. Following the analysis in *Rostenkowski*, we examine Counts Seven through Ten to determine whether the trial court will be required to interpret ambiguous Senate rules.

¶ 55. Count Seven of the criminal complaint charges Chvala with misconduct in public office because he hired Wendy Kloiber "as a State employee for the purposes of having Wendy Kloiber conduct campaign activities for State Senate Democratic Candidates." Chvala argues "whether a particular activity is political or legislative is a fact issue that would require a jury to consider the interworkings of a senator and a staff member." We disagree. Chvala is charged with having violated his duty to refrain from operating political campaigns on state time with state resources. The Senate Policy Manual and the Guidelines establish a clear duty on the part of legislators to refrain from using state resources on state time for political campaigning. These rules are not ambiguous.

¶ 56. We now consider whether the activities allegedly performed by Kloiber at Chvala's direction identified in Count Seven can clearly be classified as "conducting campaign activities." Kloiber is alleged to have been hired as a analyst in the SDC in June of 1999 for the specific purpose of running "the re-election race of then State Senator Alice Clausing." Chvala and Andy Gussert, then the Director of the Senate Democratic

152

Caucus, interviewed Kloiber. Chvala, who allegedly retained sole control over the hiring and managing of SDC staff, hired her. Kloiber stated that Gussert and Chvala discussed with her the performance of other duties but that it was made clear that her number one priority would be running Senator Clausing's re-election campaign.

¶ 57. The complaint alleges that one of Kloiber's first assignments was to set up a fundraiser for Senator Clausing. Gussert confirmed that Kloiber was hired specifically to run Senator Clausing's re-election campaign because Chvala "believed that a woman needed to run Alice Clausing's campaign." Kloiber began working on Clausing's campaign as part of her duties as an employee of the SDC. She claims to have performed legitimate legislative duties, such as constituent relations, but believes, in retrospect, that duties such as fundraising and opposition research were purely political work and improper for state employees.

■■■

¶ 58. The Senate Policy Manual clearly prohibits legislative employees from engaging in political activities on state time using state resources. Senate Chief Clerk Schneider's Guidelines, issued every May of an election year, also clearly prohibit this type of conduct. The criminal complaint unambiguously alleges that Chvala hired Kloiber to conduct a political campaign, which clearly violates both the Senate rule and the Guidelines. However, whether performing "opposition research" is in itself "political activity" is not free from doubt. We therefore conclude that evidence that Kloiber conducted opposition research does not allege a justiciable violation of Wis. Stat. § 946.12(3). However, in all other respects, Count Seven alleges a violation of § 946.12(3) that is justiciable.

¶ 59. Count Eight of the criminal complaint charges Chvala with Misconduct in Public Office because he offered state employment in the SDC to Heather Colburn "for the purposes of having Heather Colburn conduct fund-raising activities for State Senate Democratic candidates . . . ." The facts in the complaint allege that Colburn was recruited to work as a political fundraiser for the SDC during the summer of 1999 by SDC Director Gussert and participated in an interview with Gussert in September or October of 1999. Colburn claims Gussert told her she would be a full-time fundraiser at the SDC. Colburn interviewed with Gussert and eventually with Chvala at his downtown law office. Colburn said that Chvala made it clear that she was to be hired as a full-time fund-raiser for other Democratic candidates while working for the SDC. Chvala explained to her his approach to fundraising as well as how other Democratic candidates raised money. He also explained to her what her role as a fundraiser would be and discussed her fundraising background. Colburn stated it was clear to her that she was being hired as a full-time fundraiser for the SDC and not as a policy analyst. Colburn stated she knew nothing about legislative policy or how to perform other "legitimate" work for the SDC. Her entire background involved political fundraising. Colburn stated Chvala discussed with her how he assisted women in becoming elected. Gussert eventually offered Colburn the job. She rejected the offer.

¶ 60. Gussert claims he and Chvala discussed hiring a fundraiser for the SDC and interviewed Colburn for the position. Gussert also claims Chvala told Colburn that her first priority was fundraising but that she may have to do some policy work. Gussert said that

Chvala offered Colburn the job and reiterated that Chvala made all hiring decisions at the SDC.

¶ 61. The Senate Policy Manual and the Guidelines clearly prohibit Chvala from hiring individuals to engage in political campaign activity on state time using state resources. Therefore, Count Eight alleges a violation of WIS. STAT. § 946.12(3) that is justiciable.

¶ 62. Counts Nine and Ten allege that Chvala, from July 1998 through November 1998 and from July 2000 through November 2000, engaged in Misconduct in Public Office "by directing employees of the Senate Democratic Caucus to participate and manage the campaigns of Democratic candidates for the Wisconsin State Senate on State of Wisconsin time and using State of Wisconsin resources . . . ." The complaint makes the following relevant factual allegations.

¶ 63. Joanna Richard was Director of the SDC from November of 1995 until January 3, 1999; Richard was hired by Chvala. Richard was also hired by Chvala to be the Executive Director of the State Senate Democratic Committee, which has the primary purpose of assisting Democratic candidates in becoming elected to the Wisconsin Senate and promoting the Democratic agenda. Richard, as Director of the SDC, managed ten or eleven employees, including a graphics person, some data people, legislative analysts and others to work on computers. When these people were hired, it was made clear that in addition to "working for the State" they would also be working on political campaigns for Democratic candidates.

¶ 64. Work was divided up by committees and by "targets." "Targets" referred to state senate races that Chvala determined important. Richard explained that

155

Chvala identified the targets for the SDC and that the caucus staff would monitor the targeted Senator's press clippings and his or her votes. The caucus also was to monitor any committee chaired by the Senator. The caucus would focus on Republican Senators who Chvala deemed to be vulnerable. Whether these facts, if proven, support a conclusion of campaigning on state time with state resources is unclear. It is conceivable that monitoring press clippings, monitoring a Senator's committee and monitoring a Senator's votes may be construed as furthering the legislative process. We therefore conclude these facts do not allege a violation of WIS. STAT. § 946.12(3) that is justiciable.

¶ 65. Richard further explained that during non-election years, these employees performed legitimate legislative work but also performed some campaign work in their state offices on state time. One example provided was opposition research into an opponent's divorce proceedings. However, as elections drew nearer, "the amount of legitimate policy work being done by the caucus began to diminish and the amount of campaign work began to increase." An SDC staffer would be assigned to run a campaign in an important Senate district and a campaign plan would be established. Eventually, running the campaigns became the primary duty of caucus staffers.

¶ 66. During the 1998 election season, Chvala was involved in managing the caucus staffers directly and on a daily basis. Chvala approved campaign plans prepared by the SDC staffer, assigned staffers to work on particular campaigns, approved campaign literature prepared by SDC staffers and discussed campaign strategy with SDC staff members. Richard stated she was responsible for ensuring candidates were "doing doors

and making fund-raising calls." She also made sure candidates were recruiting volunteers for election day and meeting their goals as provided in the campaign plans. Chvala contacted Richard at her SDC office on a daily basis for an update on the progress of each candidate. This is clearly the type of "political activity" the Senate Policy Manual and the Guidelines were created to prevent.

¶ 67. Similar allegations are made with respect to Julie Laundrie, who was hired as an analyst with the SDC in 1995 but also worked on a special election in Stevens Point in 1996 and ran a senate race in Green Bay. In 1998, Chvala assigned Laundrie to Jon Erpenbach's senate campaign. Laundrie confirmed that during the non-election cycle, SDC staffers performed legitimate legislative work. However, according to Laundrie, during the election cycle, caucus employees devoted approximately 90% of their state time to campaign work. Laundrie admits that approximately 90% of her work for Erpenbach was from her office at the SDC on state time. Chvala contacted Laundrie daily at her caucus office to discuss the progress on Erpenbach's campaign, campaign ads and other campaign-related issues. Laundrie stated she believed Chvala expected her to perform campaign work and that she would lose her job should Erpenbach fail to be elected.

¶ 68. Lance Walter, Deputy Director of the SDC, acknowledged it was routine for SDC staffers to perform campaign work in their offices using state telephones and computers during election cycles. Walter also stated he ran the campaign for State Senator Judy Robson on state time using state resources. Walter created a campaign plan and a budget with Chvala. Chvala kept close tabs on Robson's race by contacting Walter at the SDC office on a periodic basis. Walter did

fundraising for Robson based, in part, on fundraising lists produced by Branda Weix, who performed computer data work for the SDC at SDC offices.

¶ 69. Gussert was hired as the Director of the SDC in 1999 and in early 2000 developed campaign plans and fundraising strategy with Chvala. Gussert's job during the 2000 campaign cycle was to implement the campaign plan developed by Chvala and him and to be a liaison between Chvala and caucus staff. This happened until July 2000, when Chvala began communicating directly with caucus staff on a daily basis about the campaigns they were working on. Chvala continued to call Gussert at the SDC office about campaign problems and during the height of the campaign season Chvala would call Gussert up to three to four times per day regarding campaign issues. Gussert claims that from July through November 2000, legislators knew not to request work from the caucus because the caucus became primarily a campaign machine and did not perform legitimate legislative policy work.

¶ 70. Weix communicated regularly with Chvala by memoranda regarding time sensitive campaign data. Weix and Walter developed the databases together at SDC offices. Chvala worked directly with Cindy Maracek, another caucus staffer, on campaign literature that was developed in the SDC office. Chvala approved all campaign literature. Chvala contacted Gussert to discuss the campaign literature and to edit certain literature pieces.

¶ 71. Chvala regularly communicated with Walter and Carrie Lynch about Senator Clausing's campaign. Kloiber was removed by Chvala from working on Clausing's campaign and was replaced by Carrie Lynch. Walter was assigned to work on David Hansen's campaign in Green Bay. Chvala communicated regularly

with both Lynch and Walter regarding these campaigns at the SDC offices, including campaign ads. Lynch performed some of her duties as Clausing's campaign manager from her caucus office, including drafting and approving campaign literature on state computers. Maracek performed the graphics work at caucus offices during state time. Lynch also obtained fundraising contributor lists and other data from Weix and Joel Gratz, who was another analyst at the caucus during this time. As the November 2000 election approached, Lynch substantially increased her work hours on the Clausing campaign. She regularly communicated with Gussert and Chvala about the campaign. Lynch stated that caucus employees worked on campaigns because nobody else would do it and there was not enough money to hire campaign staff. She described the campaign work as "forced labor." She was also aware of the campaign work performed by Walter and Kloiber and also by a SDC employee named Jay Wadd, who ran Mark Meyer's campaign.

¶ 72. Gussert stated Chvala never informed him that it was inappropriate to run campaigns on state time using state resources. However, he also said Chvala told him "to make sure that SDC employees took vacation or compensatory time if they were seen by outside people working on campaigns."

¶ 73. Kloiber stated she did substantial work on the Hansen campaign during the 2000 election while employed by the caucus. Kloiber met with Chvala regarding her concern that Gussert was going to remove her from the Hansen campaign and assign her to work on another campaign. Chvala assured her that she would continue to work on the Hansen campaign. Kloiber moved to Green Bay on a temporary basis so as to devote all her work time on the Hansen campaign.

159

Chvala never assigned her legitimate legislative or caucus work or inquired as to whether she was taking vacation or compensatory time to work on Hansen's campaign while she was in Green Bay. Chvala communicated with Kloiber about events Hansen should attend. Chvala also discussed with Kloiber the campaign ads to be run for Hansen. It was at this time Kloiber became aware of the total control Chvala had over the Hansen campaign.

¶ 74. At a campaign debriefing at Chvala's law office, Chvala informed Kloiber that she was to receive a 10% raise. Kloiber stated she believed the raise was linked to her performance on the Hansen campaign, based on the absence of discussion on any other topic. Gussert was replaced as Director of the SDC because Clausing lost her election; Kloiber and Chvala began searching for a full-time fundraiser. Shortly after the November 2000 elections, a staff meeting was held at the SDC offices concerning the political campaigns managed by SDC staff and Chvala discussed the successes and failures of these campaigns.

¶ 75. SDC Deputy Director Walter stated he and Gussert developed a plan for the 2000 campaigns in the SDC offices and identified Hansen's race as an important race. Walter stated he performed substantial work on Hansen's campaign including crafting the central message and general strategy advice. As Election Day approached, the majority of Walter's work performed in caucus offices was on Hansen's campaign. Walter raised funds, developed campaign strategy, and communicated with Chvala regularly about fundraising efforts. Chvala's role was to fill in the money gaps. Walter was directed to go to Chvala's law office to pick up fundraising checks directed to the Hansen race. Chvala approved all literature pieces drafted by Walter for the

Hansen campaign. Walter acknowledged that between June and November 2000, 40% of his time at the caucus was devoted to the Hansen campaign. Apparently, Chvala was aware of the amount of time Walter was spending on the Hansen campaign and would ask Walter to do "political things" because Walter worked for Chvala. Walter states that Chvala directed him to work on the Hansen campaign and that Walter had no option of refusing Chvala's request.

¶ 76. Chvala hired Meghan Bitenc to work on his legislative staff in January 2000. Bitenc had no policy experience and had worked exclusively on political campaigns. Bitenc performed some legitimate legislative work for Chvala. However, in the spring of 2000, Chvala directed Bitenc to call Barbara Candy, a very experienced Milwaukee-area fundraiser, about fundraising for the November 2000 elections. Bitenc began working with Candy and Chvala on fundraising calls, including calls made by Chvala to raise money for the Hansen campaign. These calls were made during normal work hours at Chvala's law office and Bitenc's job was to assist him and take notes regarding fundraising commitments Chvala received. Bitenc did not take vacation or compensatory time to perform this work. Bitenc also traveled to Green Bay with Candy to meet with Hansen about fundraising for his campaign, without taking any leave or vacation. Bitenc expressed her concerns about mixing campaign and legislative work with Chvala's chief of staff, Douglas Burnett. Burnett told her "that that was the way it was" and that both Democrats and Republicans did it and that the press was aware of it. Senator Hansen indicated that Walter arranged to have Sue Meinholz, who managed Chvala's legislative office, prepare his campaign finance reports and to maintain the books.

¶ 77. We conclude the allegations in Counts Nine and Ten, except as indicated in paragraph 64, unambiguously state a violation of Wis. Stat. § 946.12(3) and are therefore justiciable. The trial court will not need to speculate as to whether this conduct could include legitimate legislative activity. On the contrary, these allegations show political campaign activity of the most basic type: the preparation and dissemination of campaign literature, political fundraising efforts on behalf of a number of candidates for the Wisconsin Senate, campaign data management on state computers, daily monitoring of campaign progress by Chvala, development and implementation of campaign strategy and debriefing of the 2000 election cycle on state time in state offices. The result is public financing of private campaigns without the public's permission. There is no reasonable argument that this activity serves any legitimate legislative duty or purpose. No statute, rule or policy sanctions this behavior.

## CONCLUSION

¶ 78. For the foregoing reasons we conclude that Wis. Stat. § 946.12(3) is not vague or overly broad. We also conclude this prosecution does not violate the speech and debate clause of the Wisconsin Constitution and, with the exceptions we have noted in paragraphs 58 and 64, it does not violate the separation of powers doctrine. Accordingly, we modify the circuit court's order denying Chvala's motion to dismiss and, as modified, we affirm.

*By the Court.*—Order modified and, as modified, affirmed.