STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott R. JENSEN, Steven M. Foti, and Sherry L. Schultz, Defendants-Appellants.†

Court of Appeals

*No. 03–0106–CR. Oral argument November 20, 2003.—Decided April 1, 2004.*

2004 WI App 89

(Also reported in 681 N.W.2d 230.)

————

† Petition to review granted 6-22-04.

709

714

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Stephen J. Meyer* of *Meyer Law Office*, Madison, *Stephen L. Morgan* of *Murphy Desmond, S.C.*, Madison, and *Franklyn M. Gimbel* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin & Brown*, Milwaukee. There was oral argument by *Franklyn M. Gimbel, Stephen J. Meyer, James A. Olson* and *Stephen L. Morgan*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jennifer E. Nashold* and *Barbara L. Oswald*, assistants attorney general, and *Peggy A. Lautenschlager*, attorney general. There was oral argument by *Jennifer E. Nashold*.

Before Vergeront, Higginbotham and Anderson, JJ.

¶ 1. HIGGINBOTHAM, J. Scott R. Jensen, Steven M. Foti and Sherry L. Schultz appeal a circuit court order denying their motion to dismiss the forty-seven-page criminal complaint filed against them. Jensen, a member of the Wisconsin State Assembly and former Speaker of the Assembly, is charged with three counts of felony Misconduct in Public Office as a party to a crime, in violation of WIS. STAT. §§ 939.05 (2001–02)[1] and 946.12(3),[2] and one misdemeanor count of Intentional Misuse of Public Positions for Private

---

[1] All references to the Wisconsin Statutes are to the 2001–2002 version unless otherwise noted.

[2] WISCONSIN STAT. § 946.12 provides, in relevant part:

> Any public officer . . . who does any of the following is guilty of a Class I felony:
>
> . . . .

Benefit as a party to a crime, in violation of WIS. STAT. §§ 939.05[3], 19.45(2) and 19.58(1). Foti, also a member of the Wisconsin State Assembly and Majority Leader of the Assembly, is charged with one count of felony Misconduct in Public Office as a party to a crime, in violation of §§ 939.05 and 946.12(3). Schultz, a former employee of the State of Wisconsin in Foti's Assembly office, has been charged with one count of felony Misconduct in Public Office as a party to a crime, in violation of §§ 939.05 and 946.12(3).

¶ 2. Jensen, Foti and Schultz (the defendants) collectively argue that WIS. STAT. § 946.12(3) is unconstitutionally vague and overbroad as applied to them. The defendants also assert that the State's attempted definition of legislative duties constitutes a violation of the separation of powers doctrine. Finally, the defendants contend that the factual allegations of the complaint are insufficient to sustain probable cause. We recently addressed and rejected nearly identical arguments in *State v. Chvala*, 2004 WI App 53, 271 Wis. 2d 115, 678 N.W.2d 880. We reject them again here and affirm the order of the circuit court.

(3) Whether by act of commission or omission, in the officer's . . . capacity as such officer . . . exercises a discretionary power in a manner inconsistent with the duties of the officer's . . . office . . . or the rights of others and with intent to obtain a dishonest advantage for the officer . . . or another . . . .

[3] WISCONSIN STAT. § 939.05 states:

(1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

## FACTS

¶ 3. Jensen, a Republican, was elected to the Wisconsin State Assembly in a January 1992 special election and has been re-elected to two-year terms of office since November 1992.[4] Jensen became Speaker of the Assembly on November 4, 1997. Campaign finance records filed with the State Elections Board indicate that since 1997, Jensen has used his campaign committee, Taxpayers for Jensen, to raise money for his campaigns for political office.

¶ 4. Foti, also a Republican, was first elected to the Assembly in 1982 and has been re-elected to two-year terms of office since then. Foti has been Majority Leader of the Assembly since 1997. Schultz was a full-time state employee from January 27, 1998 until October 8, 2001, hired by Foti to work at his Capitol office.

¶ 5. The legislature created partisan caucuses in the 1960s, pursuant to WIS. STAT. § 13.20, and employed staff to further the purposes of the caucuses. According to Charles Sanders, Chief Clerk of the Wisconsin Assembly from 1971 until January 4, 2001, these partisan caucuses were created to assist legislators with speech writing, letter writing, bill drafting and other services to support legislators because, at the time the partisan caucuses were created, legislators did not have their own staff. The mission of the partisan caucuses was to assist legislators in administration, political and legislative research, policy analysis, examination of committee activities and constituent communication. One of

---

[4] All factual references derive from the criminal complaint. For the purposes of this opinion only we accept all allegations as true.

the four authorized partisan caucuses was the Assembly Republican Caucus (ARC). The director of the ARC reported directly to the Assembly Speaker.

¶ 6. WISCONSIN STAT. § 11.265 authorizes the creation and operation of Legislative Campaign Committees (LCCs) for each party in the two legislative houses. LCCs solicit and distribute political contributions for candidates of a political party for legislative office. LCCs are governed by WIS. STAT. ch. 11. The Republican Assembly Campaign Committee (RACC) was an LCC.

¶ 7. On October 18, 2002, following an eighteen-month John Doe investigation, the State issued a forty-seven-page criminal complaint against the defendants. The criminal complaint alleges that both Jensen and Foti, in their capacities as public officers, exercised their discretionary powers in manners inconsistent with their duties by hiring, retaining and supervising Schultz to solicit, account for, distribute and publicly report money for political campaigns and assist others in those same tasks during times when Schultz was compensated as a state employee or using state resources or both.

¶ 8. The complaint further alleges that Jensen intentionally hired, retained and supervised Ray Carey and Jason Kratochwill, state employees, to recruit and otherwise directly assist candidates for political office as candidates. Carey and Kratochwill were compensated as state employees using state resources or both. The complaint also alleges that Jensen, with the intent to obtain a dishonest advantage for Taxpayers for Jensen, intentionally retained and supervised state employees to work for Taxpayers for Jensen during times when the employees were compensated as state employees or using state resources or both. Finally, the complaint alleges that Schultz exercised her discretion-

ary powers inconsistent with the duties of her employment, with the intent to obtain a dishonest advantage for others, by soliciting, accounting for, distributing and publicly reporting money for political campaigns, and assisting others in those same tasks, during times when she was compensated as a state employee or using state resources or both. The particulars of each count charged will be discussed later in this opinion.

¶ 9. On December 13, 2002, the defendants moved to dismiss the criminal complaint on various grounds. On December 20, 2002, the defendants filed additional motions and supporting documents, including motions to dismiss for lack of probable cause, a motion to dismiss for violation of the separation of powers doctrine, a motion to strike and a motion for disclosure/supplemental to the previously filed motion for relief from secrecy order.

¶ 10. After oral argument the circuit court denied all the defendants' motions and the motion for a stay pending appeal. The defendants were bound over for trial following a preliminary hearing. We granted the defendants' petition for leave to appeal and certified the issues in a petition to the Wisconsin Supreme Court. The Supreme Court denied the petition. On March 31, 2003, the circuit court suspended the criminal proceedings pending our determination in this case. The defendants appeal the circuit court's denial of their motions to dismiss.

## DISCUSSION

### Vagueness

¶ 11. The defendants maintain that Wis. Stat. § 946.12(3) is unconstitutionally vague as applied to the facts of this case. The defendants contend that

§ 946.12(3) does not provide adequate notice because the conduct alleged in the criminal complaint is not clearly and unequivocally prohibited by § 946.12(3). Specifically, the defendants argue that neither the complaint nor § 946.12(3) adequately delineates the duty each defendant allegedly violated. The defendants also maintain that the vagueness of § 946.12(3) authorizes prosecutors to apply or create their own subjective theories, standards and interpretations of the statute. As we concluded in *Chvala*, 271 Wis. 2d 115, ¶¶ 7–21, these arguments are entirely without merit.[5]

¶ 12. We review the constitutionality of statutes de novo. *State v. Bertrand*, 162 Wis. 2d 411, 415, 469 N.W.2d 873 (Ct. App. 1991). Statutes are presumed constitutional and we review them to preserve their constitutionality. *Id*. A party challenging the constitutionality of a statute must demonstrate that it is unconstitutional beyond a reasonable doubt. *State v. Pittman*, 174 Wis. 2d 255, 276, 496 N.W.2d 74 (1993).

¶ 13. Whether a statute is unconstitutionally vague is a question of law. *Id*. A vagueness challenge must satisfy a two-prong test:

> The first prong of the vagueness test is concerned with whether the statute sufficiently warns persons

---

[5] As in *State v. Chvala*, 2004 WI App 53, 271 Wis. 2d 115, 678 N.W.2d 880, the State first argues Jensen, Foti and Schultz lack standing to challenge WIS. STAT. § 946.12(3) on vagueness grounds because they were aware of the criminality of their conduct and the consequences. *See State v. Tronca*, 84 Wis. 2d 68, 87, 267 N.W.2d 216 (1978). Because we conclude § 946.12(3) is not unconstitutionally vague on other grounds, we do not take up the issue of standing.

> 'wishing to obey the law that [their] . . . conduct comes near the proscribed area.' The second prong is concerned with whether those who must enforce and apply the law may do so without creating or applying their own standards.

*Id.* (citations omitted). A statute is not unconstitutionally vague "simply because in some particular instance some type of conduct may create a question about *its* impact under the statute." *State v. Smith,* 215 Wis. 2d 84, 91–92, 572 N.W.2d 496 (Ct. App. 1997) (citation omitted).

> The ambiguity must be such that 'one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the statute or rule.'

*Pittman,* 174 Wis. 2d at 277 (citation omitted). A person whose conduct intentionally comes close to "an area of proscribed conduct" assumes the risk that his or her conduct may fall into the area of proscribed conduct. *State v. Courtney,* 74 Wis. 2d 705, 711, 247 N.W.2d 714 (1976) (citation omitted). A criminal statute is not vague if "by the ordinary process of construction, a practical or sensible meaning may be given to the . . . [law] . . . ." *State v. Arnold,* 217 Wis. 340, 345, 258 N.W. 843 (1935).

¶ 14. Applying the *Pittman* test, we first determine whether Wis. Stat. § 946.12(3) sufficiently warns Jensen and Foti, as legislators, and all three defendants as reasonable persons wishing to obey the law, that his or her alleged conduct approaches the proscribed activ-

ity. Section 946.12(3) prohibits the exercise of a discretionary power in a manner inconsistent with the duties of an officer's office. The existence of a duty is a question of law. *State v. Schwarze*, 120 Wis. 2d 453, 456, 355 N.W.2d 842 (Ct. App. 1984).

¶ 15. The defendants make four arguments in support of their contention that WIS. STAT. § 946.12(3) does not clearly proscribe the conduct as alleged against them. First, the Legislature did not intend to have the prohibitions provided in WIS. STAT. chs. 11, 12 and 19 serve as the basis for prosecution under § 946.12(3). Second, neither § 946.12(3) nor chs. 11, 12 or 19 specifically define the duties of legislators and legislative aides. Third, the State cannot point to any case holding that chs. 11, 12 and 19 provide the requisite notice that any violation thereof violates § 946.12(3). Fourth, the criminal complaint does not allege that the defendants violated any statute contained in chs. 11, 12 and 19 nor does it allege the existence of any "duty" derived from these chapters. Rather, the defendants argue, the complaint refers only to an Assembly Clerk report, an Ethics Board opinion and some e-mails as establishing the duty that was allegedly violated. Therefore, the defendants assert, the alleged conduct is not prohibited by § 946.12(3).

¶ 16. We agree that one source of the defendants' duties is the Assembly Rules. We disagree, however, that the Rules constitute the only source from which defendants' duties may be ascertained. The defendants' arguments stand on one basic contention: their duties as legislators and as a legislative aide must be specified in a particular statute before any violation thereof can serve as a basis for prosecution under WIS. STAT. § 946.12(3). As we concluded in *Chvala*, 271 Wis. 2d 115, ¶¶ 13–21, these arguments are without merit.

¶ 17. The defendants cite no authority for the proposition that we are restricted to an exclusive statute or one exclusive source to ascertain his or her duty. The duty under WIS. STAT. § 946.12(1) "may be imposed by common law, statute, municipal ordinance, administrative regulation, and perhaps other sources . . . ." *Judiciary Committee Report on the Criminal Code,* Wisconsin Legislative Council 1953, p. 176. While this report explicitly references § 946.12(1), in *Chvala* we extended this logic to § 946.12(3) and concluded that a legislator's duty under § 946.12(3) may be ascertained by reference to an assortment of sources. *Chvala,* 271 Wis. 2d 115, ¶ 13.

¶ 18. In this case, the assortment of sources includes applicable statutes, legislative rules and guidelines and the Assembly Employe Handbook. *See State v. Tronca,* 84 Wis. 2d 68, 80, 267 N.W.2d 216 (1978) ("the powers of a public official . . . are not limited to expressly conferred powers but apply to *de facto* powers which arise by custom and usage . . . ."); *see also Chvala,* 271 Wis. 2d 115, ¶ 13. We now address the scope of the defendants' duties as legislators and state employees.

¶ 19. The general duty of a legislator is to determine "policies and programs and review . . . program performance for programs previously authorized . . . ." WIS. STAT. § 15.001(1). We next explore other sources for the defendants' duties in light of this general pronouncement.

¶ 20. WISCONSIN STAT. ch. 19 addresses "General Duties of Public Officials" and contains a subchapter entitled "Code of Ethics for Public Officials and Employees." WISCONSIN STAT. § 19.45, contained within this Code of Ethics, states, in relevant part,

(2) No state public official may use his or her public

724

position or office to obtain financial gain or anything of substantial value for the private benefit of himself or herself or his or her immediate family, or for an organization with which he or she is associated.

Furthermore, WIS. STAT. § 19.46 states, in relevant part,

(1) . . . no state public official may:

. . . .

(b) Use his or her office or position in a way that produces or assists in the production of a substantial benefit, direct or indirect, for the official . . . or an organization with which the official is associated.

Under these statutes, both Jensen and Foti had a duty to avoid using their offices to assist private political campaigns and organizations including but not limited to organizations such as Taxpayers for Jensen and the RACC.

¶ 21. In addition, WIS. STAT. § 11.001(2) prohibits an incumbent from obtaining an unfair advantage over a non-incumbent:

This chapter is also intended to ensure fair and impartial elections by precluding officeholders from utilizing the perquisites of office at public expense in order to gain an advantage over nonincumbent candidates who have no perquisites available to them.

Under this statute, Jensen and Foti had a duty to avoid using the perquisites of office at public expense in order to gain an advantage over nonincumbent candidates in their own campaigns and the campaigns of other candidates.

¶ 22. Other statutes delineate the defendants' duties. WISCONSIN STAT. § 12.07(3) expressly prohibits employers and others from requiring anyone to do cam-

paign work as a condition of employment. Jensen and Foti are alleged to have hired Schultz for the sole purpose of performing campaign fundraising. Although Schultz on the rare occasion answered telephone calls to the ARC unrelated to campaigns, Jensen and Foti hired her to raise campaign funds, not perform legitimate ARC services.

¶ 23. WISCONSIN STAT. § 11.36 specifically prohibits public officials from soliciting or receiving contributions or services while engaged in their official duties and also requires officials supervising a particular office on state property to prohibit others from entering the office for the purpose of making or receiving campaign contributions. The complaint alleges Jensen and Foti hired and supervised Schultz to use their offices in the Capitol annex and at the ARC to conduct campaign fundraising. The complaint further alleges lobbyists delivered campaign contribution checks to Foti's Capitol office. Jensen is alleged to have made numerous fundraising calls from his office and to have brought in campaign checks for his staff, including Schultz, to enter into a campaign database. The defendants clearly had a duty to refrain from this type of conduct.

¶ 24. The Assembly's own policy guidelines, which John Scocos, Assembly Chief Clerk, considers to be Assembly Rules, are consistent with these statutes and prohibit any political activity during working hours with state-owned facilities and equipment. The Assembly Employe Handbook was introduced into evidence at the preliminary hearing and states, in part,

> Political activity is not permitted during working hours. State owned facilities, office equipment, supplies, etc., may not be used for political purposes

anytime. Citizenship rights to political activity and community involvement must be exercised on non-office time.

¶ 25. As did Chvala, the defendants argue that the term "political activity," as used in the Assembly Employe Handbook, does not include political campaign activity. It is unreasonable to equate "political activity" with "legislative activity." *See Chvala*, 271 Wis. 2d 115, ¶ 16. Rather, it is apparent from the context in which these words are used that the Assembly Employe Handbook restricts the precise type of activity alleged in this case: political campaigning with public resources. The Assembly's own rules prohibit the type of conduct in which the defendants allegedly engaged.

¶ 26. In addition to the allegation of the standing prohibition on political activity on state time with state resources contained in the Assembly Employe Handbook, the criminal complaint alleges that on February 27, 1997, an e-mail was sent to all Assembly members from Representative Ben Brancel, then speaker of the Assembly, which stated

> An e-mail message of a political nature was inadvertently sent by a new Assembly employee today.
>
> This serves as a reminder to all Legislative staff that political activity, whether partisan or non-partisan is not permitted during working hours. Furthermore, all state owned facilities, office equipment, including the electronic mail system, and all other state owned supplies and materials are **strictly prohibited** from use for a political purpose anytime. This means both use during and after business hours.
>
> Citizenship rights to political activity and community involvement must be exercised on non-office time and equipment.

¶ 27. Legislators were given similar notice in a May 16, 2000, memo addressed to "Legislators and Staff," from Charlie Sanders, Chief Assembly Clerk:

> Political activity is not permitted during working hours. State owned facilities, office equipment, supplies, etc., may not be used for political purposes anytime. Citizenship rights to political activity and community involvement must be exercised on non-office time.

Sanders sent a similar e-mail every election year regarding this prohibition.

¶ 28. The Wisconsin Ethics Board issued an advisory opinion in 1978 stating in part

> A legislative employee should not engage in campaign activities (a) with the use of the state's facilities, supplies, or services not generally available to all citizens; (b) during working hours for which he or she is compensated for services to the State of Wisconsin, or at his or her office in the Capitol regardless whether the activity takes place during regular working hours.

Ethics Board 138, July 27, 1978. These cautionary warnings are substantially the same as the prohibition expressed in the Assembly Employe Handbook. Clearly Jensen, Foti and Schultz had adequate notice of their duty to refrain from engaging or directing legislative and caucus staffers from engaging in campaign-related activity while using state resources and state time.

¶ 29. The defendants' duties are sufficiently delineated in the Assembly Employe Handbook, the e-mail from Representative Brancel, the memo from Charlie Sanders, the Ethics Board 1978 advisory opinion and Wis. Stat. §§ 11.001(2), 11.36, 12.07(3), 19.45 and 19.46 such that a reasonable person would be aware that using discretionary powers to obtain a dishonest advan-

tage over others by waging partisan political campaigns with state resources on state time violates one's duty as a public official. We conclude that the defendants have not satisfied the first criteria of *Pittman,* whether the statute sufficiently warns a person wishing to obey the law that their conduct comes near the proscribed area, because Jensen and Foti had sufficient notice that hiring and directing ARC staffers to work on political campaigns on state time with state resources violated their duties as public officials and therefore violated WIS. STAT. § 946.12(3), and Schultz had sufficient notice that political campaign fundraising on state time with state resources violated her duty in violation of § 946.12(3).

¶ 30. The second prong of the *Pittman* test for vagueness, whether those who must enforce and apply the law may do so without creating or applying his or her own standards, is also unsatisfied.[6] The defendants argue they were not aware they could face felony prosecution for engaging in campaign-related activities on state time with state resources. As we said in *Chvala,* 271 Wis. 2d 115, ¶ 17, it is irrelevant that the defendants were unaware they could be prosecuted for violating WIS. STAT. § 946.12(3). The vagueness challenge is based upon what a reasonable person who is intent on obeying the law can be expected to understand of the law's prohibitions. Ignorance of the law is no defense. *State v. Collova,* 79 Wis. 2d 473, 488, 255 N.W.2d 581 (1977).

---

[6] The defendants advance a "retroactive interpretation of criminal statutes" argument. This argument is simply another approach to the "lack of notice" argument. Therefore we do not separately address it.

¶ 31. The defendants attempt to justify their conduct by declaring that participation in political activities by a legislator and legislative aide is not inconsistent with legislative duties. They argue that the scope of Wis. Stat. § 946.12(3) does not extend to campaign finance or election laws. We agree that § 946.12(3) is not a campaign finance law or election law. The defendants fail to understand, however, that they are not being prosecuted for violating any campaign finance or election laws. Rather, they are facing prosecution for violating a criminal statute, namely § 946.12(3), which prohibits officials, such as the defendants, from violating their duty as public officials. In this case, those duties are found, in part, within the campaign finance and election law statutes.

¶ 32. Defendants Jensen and Foti argue that engaging in political activity on state time with state resources is actually consistent with their duties as Assembly leaders. They claim that part of their duties as Assembly leaders was to actively promote the election of "like-minded legislators" so as to advance their political legislative agenda. We soundly reject their argument. Jensen and Foti's duty is to determine "policies and programs and review . . . program performance for programs previously authorized . . .," Wis. Stat. § 15.001(1), and to effectuate this duty consistent with the Assembly's internal rules and the statutes. We can find no duty that allows Jensen and Foti to engage in political activity on state time with state resources.

¶ 33. However, a clear duty has been established prohibiting the defendants from engaging in the conduct alleged in the complaint. The standards are clear for those who enforce and apply Wis. Stat. § 946.12(3). The defendants' duty as legislators and state employees is to refrain from directing state employees to manage

730

political campaigns and to engage in political activity. This standard is unambiguous and can be handily applied. Section § 946.12(3) is not unconstitutionally vague as applied to this case.

### Overbreadth

¶ 34. The defendants next argue that WIS. STAT. § 946.12(3) is unconstitutionally overbroad because it purports to criminalize legitimate legislative activity: ensuring the passage of legislation supported by the legislators' constituents by encouraging and supporting the candidacy and election of like-minded persons. Similar to the contentions made in *Chvala*, 271 Wis. 2d 115, ¶¶ 22–28, this argument fails. To suggest that the activities alleged in the complaint — encouraging and in fact requiring state employees to work on private campaigns with state resources on state time — are legitimate legislative activities belies common sense. The charged violations of § 946.12(3) are reasonable and content-neutral restrictions.

¶ 35. An overbreadth challenge to a statute invokes the protections of the First Amendment to the United States Constitution. *See generally State v. Stevenson*, 2000 WI 71, 236 Wis. 2d 86, 613 N.W.2d 90. Invalidation of a statute on overbreadth grounds is "strong medicine" that is "employed by the Court sparingly and only as a last resort." *State v. Janssen*, 219 Wis. 2d 362, 373, 580 N.W.2d 260 (1998) (citation omitted). "A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." *Id.* at 374 (citation omitted). The overbreadth doctrine

is grounded in the right to substantive due process and "has the effect of preventing the limiting, by indirection, of constitutional rights." *Tronca,* 84 Wis. 2d at 89 (citation omitted).

¶ 36. WISCONSIN STAT. § 946.12(3) is aimed at specific conduct which, in this case, goes to the use of state resources in conducting political campaigns. Legislators or their employees are not prohibited from participating in political campaigns so long as they do not use state resources for that purpose. Moreover, legitimate legislative activity is not constrained by this statute. The line between "legislative activity" and "political activity" is sufficiently clear so as to prevent any confusion as to what conduct is prohibited under this statute. To the extent legitimate legislative speech is affected, it is purely secondary to the offensive conduct of campaigning on state time with state resources. *See State v. Robins,* 2002 WI 65, ¶ 43, 253 Wis. 2d 298, 646 N.W.2d 287, cert. denied, 537 U.S. 103 (2002).

¶ 37. The defendants' overbreadth challenge centers on the following hypothetical:

> Assume that a bill is pending related to campaign finance reform. Legislator A and his party seek to eliminate all PAC money. Legislator A believes that the campaign finance report of Legislator B, a member of another political party who opposes the bill, would disclose Legislator B's heavy reliance on PAC money. Legislator A wants to disclose that report in order to demonstrate why the reform bill should be passed.
>
> Legislator A assigns to his aide the task of obtaining a copy of Legislator B's report and disseminating it to other supporters of the bill. With Legislator A's consent, the aide accomplishes this task during normal business hours. Armed with the report, the members of Legislator A's party not only challenge the pending bill,

but also, because the report was disclosed during the public debate, use it as the focal point for the candidate challenging Legislative B's reelection bid.

¶ 38. This line of reasoning does not support the defendants' overbreadth assertions. The hypothetical is plainly not prohibited activity under Wis. Stat. § 946.12(3). The acquisition of the campaign finance report in the hypothetical was to challenge a pending bill, a clear legislative and non-campaign purpose. Here, on the other hand, the allegations are that the defendants had state employees use their publicly funded positions almost exclusively for campaign-related activities and fundraising. Legislators and reasonable persons should and would know the difference. In addition, the allegations before us speak of conduct which, on its face, cannot reasonably be construed as legitimate legislative activity. Such activity includes campaign fundraising, preparation and maintenance of campaign finance reports, candidate recruitment and campaign strategy development. Moreover, the Assembly Employe Handbook, the e-mail from former Assembly Speaker Brancel, the memo from Charlie Sanders and the Ethics Board advisory opinion provide unambiguous guidance as to when the lines between legislative activity and political activity are crossed. This hypothetical does not present any scenario under which an individual's fundamental right to free speech is encroached.

¶ 39. The defendants also suggest that contact between legislative aides and constituents could also fall under the rubric of Wis. Stat. § 946.12(3). We disagree. Constituent contact related to legitimate legislative business does not violate the prohibitions of

§ 946.12(3), even if in doing so the aides hope that the positive contact will encourage future campaign contributions. Despite the defendants' arguments to the contrary, under no reasonable view is it "campaigning" to "return[] the phone call of a constituent who has a question on the legislator's opinion on an issue . . . ."

¶ 40. We are unable to envisage any state of affairs, based upon the suggestions proffered by the defendants, where a legislator or state employee could be prosecuted for engaging in legitimate legislative activity. WISCONSIN. STAT. § 946.12(3) would apply only if the defendants engaged in conduct involving the use of state resources on state time for activities falling outside legitimate legislative activity. We conclude § 946.12(3) is not overbroad.

### *Separation of Powers*

¶ 41. The defendants next argue that the State's attempted definition of legislative duties constitutes a violation of the separation of powers doctrine. The defendants first contend that under WIS. CONST. art. IV, § 8, the Assembly has the exclusive power to regulate, police and discipline its own members. The defendants also claim that consideration of whether a particular activity is "legislative" or "political" is a non-justiciable "political question" and is therefore beyond the court's inquiry. We rejected virtually indistinguishable claims in *Chvala*, 271 Wis. 2d 115, ¶¶ 42–77, and, for the same reasons, reject them here.

¶ 42. Whether a statute violates the doctrine of separation of powers presents a question of law. *Barland v. Eau Claire County*, 216 Wis. 2d 560, 572, 575

N.W.2d 691 (1998). "The doctrine of separation of powers, while not explicitly set forth in the Wisconsin constitution, is implicit in the division of governmental powers among the judicial, legislative and executive branches." *State ex rel. Friedrich v. Dane County Circuit Court*, 192 Wis. 2d 1, 13, 531 N.W.2d 32 (1995). "The Wisconsin constitution creates three separate coordinate branches of government, no branch subordinate to the other, no branch to arrogate to itself control over the other except as is provided by the constitution, and no branch to exercise the power committed by the constitution to another." *State v. Holmes*, 106 Wis. 2d 31, 42, 315 N.W.2d 703 (1982). "Each branch has a core zone of exclusive authority into which the other branches may not intrude." *State ex rel. Friedrich*, 192 Wis. 2d at 13. In these core areas, "*any* exercise of authority by another branch of government is unconstitutional." *Barland*, 216 Wis. 2d at 573–74 (citation omitted).

¶ 43. However, the majority of governmental powers lies within areas of shared authority, where the powers of the branches overlap. *Id.* at 573. "In these areas of 'shared power,' one branch of government may exercise power conferred on another only to an extent that does not unduly burden or substantially interfere with the other branch's exercise of power." *Id.*

¶ 44. The defendants assert that because the Assembly passed and approved the Assembly Rules, which delineate the duties of legislators, the State seeks to "usurp this exclusive zone of legislative power" by interpreting the duties of WIS. STAT. § 946.12(3) to include provisions of WIS. STAT. chs. 11, 12 and 19. The defendants rely upon *State ex rel. La Follette v. Stitt*, 114 Wis. 2d 358, 338 N.W.2d 684 (1983), implying that

*Stitt* establishes an absolute bar to the judiciary interpreting legislative rules absent a constitutional mandate to do so or a deprivation of constitutionally protected rights.

¶ 45. The defendants misinterpret *Stitt*. The *Stitt* court addressed, *inter alia,* whether the court had the authority to determine whether the legislature complied with its own internal operating rules or procedural statutes while enacting legislation. *Stitt,* 114 Wis. 2d at 364. The court was reluctant to make such a determination because of the separation of powers doctrine. *Id.* at 364–65.

¶ 46. That is not the issue before us. The court is not being asked to enforce legislative rules vis-à–vis the enactment of legislation. Instead, the court is being asked to enforce a penal statute associated with the duties of legislators and state employees, which are relevant insofar as the statute furnishes affected persons notice of those duties.

¶ 47. We conclude that consideration of the Assembly Employe Handbook, Representative Brancel's e-mail and Charlie Sanders's memo, in order to determine whether the defendants violated their duties as legislators and state employees, does not encroach upon the legislature's authority to establish its own rules of conduct and to discipline its members for any violation thereof. The defendants are not facing prosecution for violating the Assembly's internal rules. They are facing prosecution for having allegedly committed criminal misconduct in office.

¶ 48. The defendants also assert that a determination of whether a specific activity is legislative or political is necessarily a "political question" and is

therefore non-justiciable under *Baker v. Carr*, 369 U.S. 186 (1962). In *Baker*, the United States Supreme Court considered the justiciability of claims implicating the political question doctrine. *Id.* at 209. The Supreme Court noted that various formulations of the political question doctrine involved a function of the separation of powers. *Id.* at 210–11. The Supreme Court held that an issue is non-justiciable if "prominent on the surface" of that issue it finds

> ■ a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it, or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. The first and second factors are implicated in this case.

¶ 49. The defendants contend that because the State is prosecuting them based, in part, on an Assembly Rule, to proceed with the prosecution violates WIS. CONST. art. IV, § 8 under the first *Baker* factor – a textually demonstrable constitutional commitment of the issue to another branch of government. This is simply a repeat of the argument set forth above pertaining to restrictions on the court's ability to interpret legislative rules. For reasons already stated, we reject this argument.

¶ 50. As did Chvala, the defendants focus primarily on the second *Baker* factor, the alleged lack of judicially discoverable and manageable standards for prosecution under Wis. Stat. § 946.12(3). The defendants' arguments appear to address whether the rule prohibiting engagement in political campaign activity is sufficiently ambiguous so as to be non-justiciable. *See United States v. Rostenkowski,* 59 F.3d 1291, 1306 (D.C. Cir. 1995). In *Chvala,* 271 Wis. 2d 115, ¶ 52, we construed this argument as follows: May a court interpret an internal legislative rule to determine criminal liability if, when applied to the facts of the specific case, the rule is not ambiguous? Now, as we did in *Chvala,* we conclude it can. *See id.*

¶ 51. In *Chvala,* 271 Wis. 2d 115, ¶¶ 53–54, we adopted the analysis set forth in *Rostenkowski,* 59 F.3d at 1291. It is appropriate for the judiciary to interpret legislative rules where a particular rule "is sufficiently clear that we can be confident in our interpretation." *Chvala,* 271 Wis. 2d 115, ¶ 53 (citing *Rostenkowski,* 59 F.3d at 1306). Consequently, we examine the complaint to determine whether the trial court will be required to interpret ambiguous Assembly Rules.

¶ 52. Here, the defendants' assertion that the State is asking us to ignore the Assembly Rules in favor of the prosecutor's own subjective definitions is without merit. The State does not ask us to ignore the Assembly Rules; indeed, the premise of this prosecution is that the Assembly Rules help shape the scope of the defendants' duties under Wis. Stat. § 946.12(3). The Assembly Rules expressly prohibit any "political activity" using state time on state resources and establish a clear duty to refrain from doing so. This rule is unambiguous.

We now examine whether the acts alleged in the criminal complaint can be clearly classified as "political activity."

¶ 53. Count One alleges that Foti and Jensen together hired Schultz to work in Foti's office to handle campaign fundraising as well as candidate recruitment and district travel. Both Foti and Jensen knew that Schultz was skilled in campaign work. Linda Hanson, an employee in Foti's Capitol office, and Foti discussed hiring a new legislative staffer for Foti's legislative staff who was to handle campaign fundraising, candidate recruitment and district traveling. Hanson told Foti she was very uncomfortable that Schultz was being hired as a state employee whose duties would concentrate solely on campaign-related activities. Hanson told Foti that under no circumstances was Schultz to perform campaign-related activities out of Foti's Capitol office.

¶ 54. At the time of Schultz's hiring, Jensen informed his chief of staff, Brett Healy, that Foti was willing to lend one of his staffers to assist the Assembly Republican Leadership team, which was headed by Jensen. When Foti hired Schultz, Jensen informed his staff members that Schultz would manage fundraising for candidates and vulnerable incumbents. Jensen and Foti both informed Jason Kratochwill, ARC policy director from 1995 until mid-1997, that Schultz would be responsible for individual campaign fundraising.

¶ 55. Even though Schultz was on Foti's payroll, her office was located at the ARC. Schultz visited Jensen's Capitol office approximately twice per week during campaign season and approximately twice per month the rest of the year to report on fundraising progress. Foti attended these meetings. Schultz would describe her progress in helping various candidates and Jensen would provide her a list of candidates he wanted

her to assist. Schultz coordinated fundraising events and assisted candidates with campaign finance reports. Schultz regularly attended RACC meetings, which were normally held in Jensen's Capitol office. At these RACC meetings, Schultz would inform everyone in attendance which candidates she was working with, what events were planned and how much money had been raised.

¶ 56. Schultz taught campaign fundraising at an RACC Candidate Campaign School in 1998 as part of her state employee duties. Any time the issue of campaign fundraising arose at a Leadership meeting, Jensen turned to Schultz for information. Schultz prepared call sheets for legislative leaders to use in making fundraising calls and kept track of the results of those calls as pledges came in.

¶ 57. Jensen frequently consulted with Schultz to determine how much money had been raised for a particular candidate. Schultz worked primarily with Jensen to establish dollar amounts for individual candidates to ensure that these goals were achieved. Jensen opposed relocating Schultz to non-state property because of the expense required for rental space. Jensen visited Schultz at her ARC office on several occasions. At meetings in Jensen's Capitol office, Jensen instructed Schultz to prepare campaign finance plans for vulnerable legislators. Schultz provided Jensen charts and reports detailing the amount of money raised for specific candidates. At an RACC meeting in Jensen's Capitol office after the 2000 elections, Jensen publicly thanked Schultz for all the money she had raised. Schultz informed others that Jensen wanted her to make fundraising calls, raise money for specific races and call lobbyists and legislators for specific races or candidates.

¶ 58. While both persons were located at the ARC, Kratochwill noted that Schultz was engaged almost exclusively in political campaign and fundraising work. Kratochwill observed Schultz in possession of campaign contribution checks, observed her copying campaign checks at the ARC and observed her assist candidates fill out campaign finance reports. Kratochwill prepared an RACC organizational chart listing Schultz as a "fundraising coordinator." This chart was provided to both Jensen and Foti. A telephone list for the 2000 election named Schultz as the designated "financial" person. Schultz kept track of campaign funds raised by Jensen, Foti and other legislators for specific candidates. Lobbyists dropped off contribution checks at the Foti Capitol office and told the person receiving the checks to give them to Schultz. It was not unusual for Schultz to make comments to other legislative staffers in Foti's office that she was expecting checks to be delivered at the office.

¶ 59. Schultz answered directly to Foti but also answered, to a lesser extent, to Jensen. Foti gave Schultz campaign checks he received at his residence and Schultz would keep track of the checks and make the deposits. Schultz asked Michelle Arbiture, a Foti Capitol office employee, to use the Foti Capitol office constituent database to ensure the accuracy of Foti campaign finance reports. Schultz coordinated envelope-stuffing projects and created invitations for a Foti fundraiser. Schultz kept the books for various fundraisers, recording amounts contributed. Schultz usually went on vacation when there was not a "campaign crunch."

¶ 60. In late summer 2001, after the commencement of this criminal investigation, Jensen moved Schultz from the ARC office into the Capitol annex.

Schultz eventually left state employment and worked full-time for the Republican party. No one interviewed by investigators could say Schultz performed any legitimate legislative duties while employed by the state.

¶ 61. The complaint further alleges Jensen told investigators he believes that state employees should not raise or discuss raising campaign money at all on state time. Jensen reportedly said that legislators may occasionally approach him to discuss re-election issues involving their campaigns but no telephone calls or state telephones are used between any legislators and himself for fundraising details.

¶ 62. Count One, in all respects, unambiguously alleges that Jensen and Foti mutually agreed to hire Schultz to engage entirely in campaign activity, which is inconsistent with the duties and directives stated in the Assembly Employe Handbook, Brancel's e-mail and Sanders' memo. All the activities allegedly performed by Schultz, with the permission or at the instruction of Jensen and Foti, can clearly be classified as "political activity." We conclude that Count One alleges a violation of Wis. Stat. § 946.12(3) that is justiciable.

¶ 63. Count Two charges Schultz with misconduct in public office as a party to the crime for conducting campaign activities while compensated as a state employee or using state resources or both. The complaint alleges that Foti and Jensen hired Schultz for Foti's office solely to handle campaign fundraising as well as candidate recruitment and district travel. Again, both Foti and Jensen knew that Schultz was skilled in campaign work. Despite her employment with Foti's office, Schultz's office was located at the ARC. The factual allegations as stated in ¶¶ 53–61 in this opinion

apply equally to Schultz and will not be repeated. Additional relevant facts alleged in the complaint are provided below.

¶ 64. Schultz kept track of campaign funds raised by Jensen and other legislators for specific candidates. At RACC meetings, Jensen instructed Schultz to contact particular groups to determine the size and timing of potential conduit contributions. After the *Wisconsin State Journal* series of newspaper articles were published in May 2001, alleging widespread use of state resources for campaign activities, Schultz stated she needed to "clean up the office" and noted that she could be in a lot of trouble, perhaps even facing jail time; she also stated "If I'm going down, everyone's going down with me."

¶ 65. Count Two unambiguously alleges that Schultz was hired exclusively to engage in campaign activity, which clearly does not comport with the Assembly Employe Handbook, Brancel's e-mail and Sanders' memo. All the activities allegedly performed by Schultz can clearly be classified as "political activity." Count Two alleges a violation of Wis. Stat. § 946.12(3) which is justiciable.

¶ 66. Count Three charges Jensen with misconduct in public office as a party to the crime for intentionally hiring and/or supervising Ray Carey and Jason Kratochwill, state employees, to recruit or assist candidates for political office during times when Carey and Kratochwill were compensated as state employees or using state resources or both. Count Three realleges all the facts contained in Count One and further alleges that when Jensen, as ARC director, hired Carey, Jensen expected Carey to recruit candidates to run for office, manage campaigns of Assembly Republican candidates

and help vulnerable Republican candidates maintain their Assembly seats. Carey regularly briefed Jensen on the trips he was making and pitches he was making to potential candidates. Carey instructed Rhonda Drachenberg, ARC executive assistant/office manager, to prepare a potential candidate database at the ARC.

¶ 67. In February 1997, Carey provided Jensen with a memo entitled "Review of '96 Campaign" which recommended that Leadership make it clear that staff were required to volunteer for campaign work. Carey's memo also stated that Jensen and Carey jointly decided where and when to purchase TV ads; that Jensen Capitol staffer Steve Baas's assistance was much appreciated as it "was wise to have a single dedicated person to help campaigns with earned media efforts" and Baas's efforts were "largely reactive to requests from Scott or the few staffers that understood the value of earned media;" that Carey's biggest problem with candidate recruitment is that he "did 90% of it with no help from the party and little help from legislators (except for phone calls from the leadership)."

¶ 68. Furthermore, Kratochwill stated that while Jensen officially used a committee of legislators to hire the ARC director in February 1999, Jensen handpicked committee members to ensure Kratochwill would be hired. Jensen personally offered Kratochwill the ARC director position. After Kratochwill accepted the job, Jensen specifically informed Kratochwill that his primary job duty would be candidate recruitment. Jensen and Kratochwill had a series of conversations about the job where they discussed what campaigns should be targeted and why and how to organize the RACC structure. Jensen informed Kratochwill that Jensen wanted to shift campaign resources to vulnerable candidates.

744

¶ 69. While Kratochwill was ARC director, Jensen managed the ARC and all of Kratochwill's activities. Jensen and Kratochwill spoke often, without concern about Kratochwill using state time or state resources, about candidate recruitment, district polling, assignment of ARC and legislative staffers to particular campaigns, advertising strategy, campaign staffing and funding, opposition research and many other campaign issues. Carey, Kratochwill's predecessor, had started a potential candidate database at the ARC which Kratochwill continued to maintain. Jensen never instructed Kratochwill to take leave time or otherwise perform this work off state payroll.

¶ 70. Jensen accompanied Kratochwill on some candidate recruitment trips. Jensen demanded updates on candidate recruitment from Kratochwill. Oftentimes Jensen made indirect campaign-related contacts with Kratochwill through Jensen's staff. For example, Jensen's chief of staff Healy called Kratochwill at the ARC to report that the Republican Party would be giving a large financial donation to a particular independent expenditure group. Jensen needed Kratochwill to know that the donation was part of an overall strategy to help Republican Assembly candidates.

¶ 71. Jensen and Kratochwill discussed how to get Capitol legislative staffers working on campaigns through SWARM (Staff Working for Assembly Republicans). In March 1999, Kratochwill created a memo for Jensen, labeled "Personal & Confidential," in which Kratochwill drafted an ARC organization chart listing two graphic design positions, an occupied position and a proposed position. Kratochwill asked Jensen to create this second graphic artist position at the ARC as a new state position. Jensen did so and hired a graphic artist who worked directly for Kratochwill. This March 1999

745

"Personal & Confidential" memo also included a description of a potential new state employee hire who would have the following "confidential duties:" deconstruction of 1998 (2000) target races; organization and coordination of staff training and campaign schools; development of 2000 strategy and organization design; compilation of polling, targeting and demographic data; re-design of Get-Out-The-Vote campaigns; and list development and management. Kratochwill estimated that the campaigns of fifty of the fifty-six Republican members of the State Assembly used the ARC for campaign purposes that included graphic design work.

¶ 72. Rhonda Drachenberg, executive assistant/office manager at the ARC from March 1997 to August 2000, worked on potential candidate databases at ARC offices. Eventually she was responsible for managing the database and sending out mailings to potential candidates. At some point Kratochwill asked Drachenberg to create a memo addressing "potential candidates procedures" to be used by Lyndee Wall, a new ARC staffer. Kratochwill instructed Drachenberg to include a statement in the memo saying, "Never, ever tell anyone that you are working on something for RACC, this would cause serious problems."

¶ 73. During summer and fall of 2000, Kratochwill accompanied Jensen to several meetings with Wisconsin Manufacturers and Commerce (WMC) and lobbyists from various organizations, including the Farm Bureau, the Wisconsin Builders Association, the Wisconsin Realtors Association and WMC. These meetings focused on political campaign issues and then later on particular campaigns. Kratochwill reported on certain races, campaign issues and poll results while lobbyists discussed potential financial commitments. These

meetings were, in part, to help Jensen, with input from Kratochwill, prioritize Assembly Republican spending.

¶ 74. Kratochwill also determined which ARC and legislative staffers were going to go "off" the state payroll and what their percentages of state and non-state time would be. These proposals were sent to Jensen. However, it was clear that these were "phony" numbers and that staffers were to be out in the field in the months before the election working the campaigns full-time. These staffers were paid by the state for many of those hours. For instance, even though one particular Jensen Capitol office staffer, Brian Dake, was listed as off the state payroll 50% of the time, Jensen knew that Dake was working full-time on a campaign and informed Kratochwill that Dake was totally available to work on campaigns. Despite this knowledge, Jensen signed off on a 50% leave for Dake, which was the largest percentage of time any staff person took off to work on a campaign.

¶ 75. Dake worked as an ARC staffer from December 1997 to January 2000 and then in Jensen's Capitol office beginning in January 2000. Dake stated that the environment in the Capitol prior to the Ethics Board Agreement establishing new work rules in 2001 was that everybody performed campaign activities on state time. Dake claims neither Jensen nor any staff members told him he was required to use vacation or compensation time while campaigning. Dake worked with ARC graphic artists Lee Reidesel, Eric Grant and Kacy Hack on campaign materials.

¶ 76. Carolyn Hughes was employed as a policy analyst in the ARC from May or June 2000 to September 2001. One month after starting her job, Kratochwill assigned her the responsibility of managing a campaign for an Assembly seat in northern Wisconsin. The Re-

747

publican Party of Wisconsin paid part of her wages. However, in August 2000, Hughes moved to the northern district where she worked full-time on the campaign. She performed no legitimate legislative work after moving there. Hughes continued to be paid by the state in part and by the Republican Party in part. She met with Jensen on two different occasions to discuss campaign issues such as literature drops, door-to-door visits and fundraising status.

¶ 77. In an October 16, 2002 memo from Jensen to Kratochwill, Schultz, Healy and another legislative staffer, Jensen instructed Kratochwill to survey campaign managers about how much money was needed to finish their campaign plans and how much money they could raise locally. After the newspaper allegations disclosed that the ARC had been used extensively for campaign activity, Kratochwill and Jensen had a series of discussions on the topic. Jensen never expressed surprise or misunderstanding of the allegations but instead focused more on attempting to destroy the credibility of the former ARC staffer who had spoken publicly about ARC campaign practices.

¶ 78. Tom Petri, a former ARC staffer, stated that after the newspaper allegations became public, he attended a meeting at a bar in Madison with Jensen, Representative Bonnie Ladwig and other ARC staffers. In essence Jensen told them, "Don't think you guys did anything better or worse than other caucuses or people before you. You're just the ones who were here when the shit hit the fan." Jensen is also reported to have said, "Your hard work won't be forgotten. You're not going to prison. You'll be taken care of."

¶ 79. Count Three unambiguously alleges that Jensen explicitly instructed and implicitly allowed both Carey and Kratochwill to recruit or assist candidates

for political office on state time using state money. All activities allegedly performed by Carey and Kratoch-will, at Jensen's specific instruction or with his tacit approval, can clearly be classified as "political activity." In all respects, the allegations in Count Three establish a justiciable violation of Wis. Stat. § 946.12(3).

¶ 80. Count Four charges Jensen with misconduct in public office as a party to the crime for intentionally retaining and supervising state employees to work for Taxpayers for Jensen while the employees were compensated as state employees or using state resources or both. Count Four alleges that Carrie Hoeper Richard was employed in Jensen's Capitol office from August 25, 1997 through October 7, 1999. Richard claims that from the first telephone call she received about the open position in Jensen's Capitol office, it was made clear to her that the position's responsibilities included campaign fundraising. Fundraising was discussed during her interview with Jensen at a Milwaukee brewery. At that time, Jensen informed Richard that he was thinking of running for governor and needed an organized fundraiser to do so.

¶ 81. During her first six months' employment with Jensen's office, Richard spent 50% of her time on Jensen campaign-related work. Thereafter, Richard reports, she spent approximately 80% of her time in the Jensen Capitol office doing Jensen campaign-related work. Her first task as a Jensen legislative staffer was to work on a campaign fundraiser for Jensen, which she did full-time for two weeks. Other Jensen Capitol staffers expressed great satisfaction that one person would be responsible for the fundraiser. Richard never

heard Jensen warn anyone in his office not to perform campaign activities on state property or during state time.

¶ 82. Richard worked with ARC graphic artists on Jensen campaign-related materials. She occasionally met with Jensen in his Capitol office to discuss details of fundraising events and to report on her fundraising activities. Richard became Jensen's campaign treasurer and began completing his campaign finance reports in the Jensen Capitol office. As part of her duties as treasurer for Taxpayers for Jensen, Richard entered campaign contribution information on a database that she worked on, in part, in Jensen's Capitol office. Richard received campaign contribution checks at Jensen's Capitol office; Jensen brought his campaign-related mail into the Capitol office from his home. Richard obtained the campaign contributions and entered the information into the database.

¶ 83. All Jensen Capitol office staffers helped out stuffing envelopes with fundraiser letters or thank-you notes, usually in Jensen's Capitol office. Other Capitol staff members were recruited to assist in stuffing envelopes. Jensen was not present when the envelope stuffing took place but was aware of it because staff talked with him about it and let him know when they were finished. Another Jensen Capitol office staffer, Steve Baas, regularly drafted fundraising letters for Jensen's campaign while in Jensen's office. Jensen reviewed many of these letters.

¶ 84. Baas wrote the newsletter for Jensen's Speaker's Club. The newsletter was distributed only to those who contributed at least $125 toward Jensen's campaign. Baas worked with an ARC graphic artist on the design and layout of the newsletter. Richard prepared fundraising telephone call lists for Jensen.

Jensen made some of these calls from his Capitol office. Richard provided Jensen with campaign event progress reports and created lists of potential hosts based on lists of Jensen's campaign contributors. Jensen always reviewed his fundraising letters and his campaign finance records. Most of the campaign-related conversations between Richard and Jensen occurred while both of them were in Jensen's Capitol office or during staff meetings held in Jensen's Capitol office. Richard photocopied checks for campaign finance reports using Jensen's Capitol office copy machine. Chad Taylor, who worked in Jensen's Capitol office from November 1997 to November 1999, frequently observed Taxpayers for Jensen campaign finance reports sitting on copying machines and desks in the office. When Taylor first began employment with Jensen, Jensen told him it was illegal to perform campaign activities on state time or with state resources.

¶ 85. In 1999, former ARC employee Paul Tessmer was asked by Jensen's chief of staff Healy to develop a campaign finance computer software program. It was Tessmer's understanding that Healy wanted the campaign finance reporting program for Jensen. Once Tessmer's program was operational, Richard would occasionally ask Tessmer to come to Jensen's Capitol office to help Richard with any software problem she might be having. Staffers in Jensen's Capitol office used Tessmer's software program extensively.

¶ 86. Leigh Himebauch was employed as a limited term employee in Jensen's Capitol office from October 1997 through May 2000. Although Himebauch was officially listed on the ARC payroll, she continued to work for Jensen performing the same campaign-related duties while with the ARC. While employed by both

751

Jensen and the ARC, Himebauch's primary duties involved campaign fundraising work for Taxpayers for Jensen. These duties, performed primarily in the Jensen Capitol office using state resources, included photocopying checks, entering campaign contributions in a computer database, creating and maintaining financial records for Taxpayers for Jensen and running reports or providing information to Jensen on campaign contributions. Himebauch also created lists of people for Jensen to call for campaign contributions. Himebauch's duties also included planning and scheduling data management for Jensen fundraisers. Himebauch received campaign contribution checks from various sources. Jensen brought campaign contribution checks into his Capitol office and left them for either Himebauch or Richard. Himebauch's duties also included planning, scheduling and data management for Jensen fundraisers, which encompassed invitations and thank-you letters preparation. Between May and November 2000, Himebauch worked 100% of the time on Taxpayers for Jensen, processing checks, filling out deposits, retrieving Jensen campaign mail and creating mailing lists.

¶ 87. Eventually, Himebauch moved to the Republican Party offices. She continued to perform campaign-related duties on Jensen's behalf while receiving her monthly state paycheck from the Chief Clerk's office or the ARC. Himebauch worked regular business hours from 8:00 a.m. to 5:00 p.m., Monday through Friday. She continued to use state equipment to raise campaign funds for Taxpayers for Jensen, such as a laptop computer. Himebauch handled two fundraisers for Jensen while located at the Republican Party offices. During Himebauch's entire tenure with Jensen, not once did he inform her of the impropriety of

campaigning on state time with state resources. The campaign finance reports for Taxpayers for Jensen for the period of 1998–2002 showed Himebauch was paid only $170.53 by Taxpayers for Jensen.

¶ 88. Other allegations in the complaint, too numerous to specifically address here, plainly and unambiguously paint a thorough picture of legislative and ARC staffers performing campaign-related work on behalf of Taxpayers for Jensen. Count Four unambiguously alleges that Jensen intentionally retained and supervised state employees to work for Taxpayers for Jensen while these employees were compensated as state employees or using state resources or both. All the activities allegedly performed by state employees at Jensen's specific behest or with his knowledge that benefited him through Taxpayers for Jensen can clearly be classified as "political activity." Count Four alleges a violation of WIS. STAT. § 946.12(3) that is justiciable.

■

¶ 89. Count Five charges Jensen[7] with misdemeanor intentional misuse of a public position for private benefit as a party to the crime for obtaining financial gain for the private benefit of the RACC while he was a state public official. All the previous allegations set forth for Counts One through Five are re-alleged. The complaint further alleges that a Wisconsin Representative employed Virginia Mueller Keleher from August 1994 to December 2000. During 1995 and 1996, Keleher performed RACC duties while paid as a full-time state employee. Starting in June 1996,

---

[7] Count Five of the criminal complaint also charges Bonnie L. Ladwig with misdemeanor intentional misuse of a public position for private benefit. However, Ladwig did not participate in this appeal and her alleged involvement will not be addressed in this decision.

Keleher's office was located at the ARC but she performed duties solely for RACC. In performing her RACC duties, Keleher had at least weekly contact with Jensen. Jensen frequently sent his staff to Keleher for information on RACC money received. In addition, it was not unusual for Jensen to visit the ARC directly to obtain RACC information. In February 1997, Keleher delivered her RACC materials to Representative Ladwig and eventually to Greg Reiman.

¶ 90. Greg Reiman was employed by Jensen's Capitol office as a limited term employee from September 1996 until January 1997. In January 1997, Reiman began work in the Ladwig Capitol office where he remained until the end of 1998. Reiman occasionally attended RACC meetings which were held in Jensen's office. Typical discussions involved RACC fundraising and expenditures, proposed budgets and vulnerable candidates. Toward the end of 1998, Reiman was informed that Assembly Republican leadership wanted Remain to help with a special project, specifically, to track over the course of an entire election cycle all special interest contributions to every candidate. Reiman was informed the project was a big favor for Jensen and he was sent to Jensen's office for further instructions.

¶ 91. Jensen explained to Reiman that he was to create a thorough analysis of special interest money going into all Assembly races, creating a comprehensive money trail for the entire election cycle for the entire Assembly. Jensen informed Reiman that it might be better for him to leave Ladwig's office and Jensen would help find Reiman a job in the Capitol after the project was complete. Jensen told Reiman to go to the ARC and have ARC Director Carey find him office space to work on the project. Reiman's work on the special project,

which included three separate reports that were provided to Jensen, lasted from August to December 1998. Both Jensen and Ladwig supervised Reiman. Jensen used the results of this project to request contributions from lobbyists to RACC.

¶ 92. Count Five unambiguously alleges that Jensen obtained financial gain for the private benefit of the RACC while he was a state public official. This conduct violates his duty as set forth in the Assembly Employe Handbook, Brancel's e-mail, Sanders' memo and WIS. STAT. § 19.45(2) to refrain from "political activity" using state resources. Count Five alleges a justiciable violation of § 19.45(2).

¶ 93. All the allegations of the criminal complaint describe campaign activity of the most basic type: the preparation and dissemination of campaign literature, political fundraising on behalf of a number of candidates for the Wisconsin Assembly, the delivery and receipt of campaign funds in state offices by lobbyists and state employees, campaign data management on state computers, daily monitoring of campaign progress by all three defendants, development and implementation of campaign strategy and debriefing of an election cycle on state time in state offices. The result: public financing of private campaigns without the public's permission. There is no reasonable argument that this alleged activity serves any legitimate legislative duty or purpose. No statute, rule or policy sanctions this behavior.

### Probable cause

¶ 94. Finally, the defendants argue the factual allegations of the complaint are insufficient to sustain probable cause. Specifically, the defendants argue the

criminal complaint fails to present any facts demonstrating that their conduct was inconsistent with the duties of their offices or employment and the criminal complaint contradicts itself in attempting to allege that Schultz exercised any discretionary power. We disagree with these contentions.

■■■■■

¶ 95. The sufficiency of a criminal complaint is a question of law we review de novo. *State v. Manthey*, 169 Wis. 2d 673, 685, 487 N.W.2d 44 (Ct. App. 1992). A criminal complaint is a self-contained charge which must set forth facts that are sufficient, in themselves or together with reasonable inferences to which they give rise, to allow a reasonable person to conclude that a crime was probably committed and that the defendant is probably culpable. *State v. Bembenek*, 111 Wis. 2d 617, 626, 331 N.W.2d 616 (Ct. App. 1983). When the sufficiency of the criminal complaint is challenged, the facts alleged in the complaint must be sufficient to establish probable cause, not in a hypertechnical sense but in a minimally adequate way through a common-sense evaluation by a neutral judge making a judgment that a crime has been committed. *Id.* The judge need only be able to answer the hypothetical question: "What makes you think the defendant committed the offense charged?" *Id.* at 626–27. The complaint is sufficient if it answers the following questions: What is the charge? Who is charged? When and where is the offense alleged to have taken place? Why is this particular person being charged? Who says so? *Id.* at 627. Where reasonable inferences may be drawn establishing probable cause that supports the charge, and equally reasonable inferences may be drawn to the contrary, the criminal complaint is sufficient. *Manthey*, 169 Wis. 2d at 688–89.

¶ 96. After reviewing the criminal complaint, we are satisfied that it answers all the required questions. As to the first question, "What is the charge?," the complaint states that Scott R. Jensen is charged with three counts of felony Misconduct in Public Office as a party to a crime, in violation of Wis. Stat. §§ 939.05 and 946.12(3) and one misdemeanor count of Intentional Misuse of Public Positions for Private Benefit as a party to a crime, in violation of §§ 939.05, 19.45(2) and 19.58(1); Steven M. Foti is charged with one count of felony Misconduct in Public Office as a party to a crime, in violation of §§ 939.05 and 946.12(3); and Sherry L. Schultz is charged with one count of felony Misconduct in Public Office as a party to a crime, in violation of §§ 939.05 and 946.12(3).

¶ 97. As to the second question, "Who is charged?," the complaint states that Scott R. Jensen, Steven M. Foti and Sherry L. Schultz are charged with the crimes listed. As to the third question, "When and where is the offense alleged to have taken place?," the complaint states that the alleged offenses occurred over a period of time (from approximately 1997 through 2000) at various state government offices in Madison, Wisconsin.

¶ 98. As to the fourth question, "Why is this particular person being charged?," the complaint contains numerous allegations that are sufficient, together with reasonable inferences, to allow a reasonable person to conclude that Jensen, Foti and Schultz probably committed the crimes charged. The facts of each count have previously been set forth at length and will not be repeated. The complaint more than adequately justifies why these three defendants have been charged.

¶ 99. As to the fifth question, "Who says so?," the complaint indicates that the complaining witness is

Wisconsin Department of Justice — Division of Criminal Investigation Director David Collins and contains an affidavit from Collins in his official capacity. Collins learned of the alleged offenses from his own observations and the reports of DCI special agents prepared in the course of their duties.

¶ 100. It is well-settled that a complaint need not establish a defendant's guilt beyond a reasonable doubt. *Bembenek*, 111 Wis. 2d at 628. The complaint is the first of many steps in a criminal prosecution and its essential function is informative, not adjudicative. *Id.* The factual allegations here are more than sufficient to support probable cause.

## CONCLUSION

¶ 101. For the foregoing reasons we conclude that WIS. STAT. § 946.12(3) is not vague or overly broad. We also conclude this prosecution does not violate the separation of powers doctrine. Moreover, we conclude that the criminal complaint is sufficient to sustain probable cause. Accordingly, we affirm the circuit court's order denying the defendants' motion to dismiss.

*By the Court.*—Order affirmed.